[No. G030325. Fourth Dist., Div. Three. Nov. 21, 2003.]

RUS, MILIBAND & SMITH, Cross-complainant and Appellant, v. CONKLE & OLESTEN et al., Cross-defendants and Respondents.

COUNSEL

Rus, Miliband & Smith, Ronald Rus, Randall A. Smith and Jay B. Wallace for Cross-complainant and Appellant.

Conkle & Olesten, William C. Conkle and Eric S. Engel for Cross-defendant and Respondent Conkle & Olesten.

Law Office of Phillip K. Fife, Phillip K. Fife and Ryan M. Craig for Cross-defendant and Respondent Goodrich, Goodyear & Hinds.

OPINION

**SILLS, P. J.—**

## I. INTRODUCTION

A real estate empire collapses. The estate's bankruptcy trustee, through its attorney of record, sues the empire's accountants for their role in the collapse. The parties settle. As part of the settlement, the trustee's attorneys now represent the accountants in a suit against their malpractice insurer on a contingency fee basis (while still representing the trustee in enforcing the settlement). The accountants waive the obvious conflict.

The accountants then write a letter asking some questions as to the basis for the suit against their malpractice insurer, which they have every right to do. After all, it is just as likely that *they* will be sued for malicious prosecution as the attorneys if the lawsuit is unsuccessful. The attorneys, however, are offended. Perhaps they sense they are being set up to take the fall if the litigation fails and they and their clients find themselves sued for malicious prosecution. But they never say that. In their motion to withdraw as counsel, they merely cite, without elaboration, a "break down in communications."

The accountants, however, don't think the differences are irreconcilable and oppose the withdrawal. Now chastened and humbled for being so uppity as to question their lawyers, they practically beg the attorneys to return.

The accountants lose the withdrawal motion. The trial court will not force unwilling lawyers to work for willing clients. So the accountants thrash around for a new law firm, and eventually find one, but not one willing to take the case on contingency.

Then comes the surprise. With their new attorneys, the accountants settle with the malpractice insurer on favorable terms, obtaining a large sum of money. The original attorneys return to assert a quantum meruit claim on the settlement. Can they?

■ Of course not. Taking umbrage at being asked facially legitimate questions by one's client about the basis for a lawsuit is not justifiable cause warranting recovery in quantum merit. (See *Estate of Falco* (1987) 188 Cal.App.3d 1004, 1014–1018 [233 Cal.Rptr. 807].) Clients have every right to ask questions of their lawyers as to the basis of a lawsuit, and the asking of such questions is not a reasonable basis to claim a "break down in communications." If there was any "break down," it was the lawyers who did not want to answer legitimate questions posed by their clients as to the validity of their clients' claims against their malpractice carrier.

## II. FACTS

### A. The Bankruptcy Trustee Sues the Accountants

The Hill Williams real estate empire collapsed in the early 1990's. By 1998 Hill Williams had been sentenced to federal prison. Charles W. Daff was appointed Chapter 7 Trustee. Rus, Miliband & Smith (the Rus firm) served as the Trustee's counsel.

The Rus firm sued numerous potentially liable parties, including their future client, Goodrich, Goodyear & Hinds (the accountants), which had served as the prebankruptcy accountants for the Hill Williams entities. The accountants allegedly had neglected to abide by standard accounting practices in handling matters for Hill Williams. The accountants faced, in addition to the Trustee's action, three other similar actions for professional negligence based on the same facts.

The accountants informed their malpractice insurer of the four actions against them. The malpractice insurer took the position that the claims made against the accountants arose out of a single occurrence, such that only the

accountants' 1993 malpractice insurance policy year applied. That was a self-liquidating policy with $1 million in maximum coverage.[1]

Despite the limit in the face of so much potential liability, the accountants were able to settle all related malpractice actions against them except for the action by Trustee Daff, with $300,000 still left on the policy.

While the $300,000 was not enough to settle with Trustee Daff outright, a settlement was put together. A typical approach when a party is facing a judgment in excess of insurance limits is to assign to the third-party claimant all rights against the insurer in exchange for a personal release from liability combined with a covenant not to execute on the judgment which the party allows to be taken against it. (See, e.g., *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220 [178 Cal.Rptr. 343, 636 P.2d 32].) That is a fairly straightforward arrangement which allows the third-party claimant to prosecute a bad faith case in his or her own right.

In the settlement with Trustee Daff, however, there was no assignment. The accountants retained all their rights against their malpractice insurer. They did, of course, obtain a covenant not to execute, while allowing a stipulated $40 million judgment to be taken against them. But the accountants also agreed that they would pay to the Trustee the (by then reduced to) $250,000 remaining from the policy and they themselves undertake the task of filing a verified complaint against the malpractice insurer.

The sweetener in the deal was that the attorneys for Trustee Daff would represent the accountants in the contemplated bad faith action against the malpractice insurer. Accordingly, the Trustee's attorneys would receive 43 percent of any recovery made within 10 days of trial or afterward, which would come off the top of the settlement. Of the remainder, 90 percent would go to Trustee Daff. The accountants would be left with 10 percent.

In practical effect, the settlement meant that the thousands of hours the Rus firm had spent *suing* a group of accountants with maybe $300,000 remaining in insurance money could now be put to potentially more profitable use *representing* the accountants against their malpractice insurer. Of course both Trustee Daff and the accountants signed waivers of the obvious conflict of interest.

---

[1] Under a self-liquidating policy, the limit of liability available for paying losses is reduced by the costs of defense. A self-liquidating policy is also known as a "wasting," "cannibalizing," "self-consuming," or "defense within limits" policy. This is because the available indemnity limit may be eaten or "wasted" by the costs of defense. (Munro, *Defense Within Limits: The Conflicts of "Wasting" or "Cannibalizing" Insurance Policies* (2001) 62 Mont. L.Rev. 131, 133.)

## B. The Accountants (Represented by the Trustee's Attorneys) Sue the Malpractice Insurer

The Rus firm prepared a bad faith complaint based on the theory that the malpractice insurer had acted in bad faith in denying coverage under the 1992, 1994 and 1995 policies. The malpractice insurer demurred. Instead of opposing the demurrer, the Rus firm simply redrafted the first amended complaint, making several minor technical changes to address the legal arguments in the demurrer and then submitted a copy of the draft to the accountants for review.

At this point the accountants and the Rus firm exchanged several letters leading to the Rus firm's withdrawal. So the reader may know the flavor of each letter, we reproduce it in full in the margin after each summary.

### 1. *Letter One: The Accountants to the Rus Firm*

The first letter, sent January 20, 1999, was from the accountants to the Rus firm. Its most prickly points were these:

—The first amended complaint contained a number of allegations which did "not accurately" state the "beliefs" of two of the accounting partners.

—The author and one of his partners would never "testify falsely or suggest as true something that we do not believe to be true," though they quickly added that they were sure the law firm would not want them to. They also mentioned that they would not verify any discovery responses which they did not "believe to be true."

—The accountants anticipated that the lawyers would show them "why we were wrong to believe" that the malpractice insurer "had treated us fairly" and they had an "open mind" about the subject.

—The accountants asked: If the lawyers wanted the accountants to agree that the malpractice insurer had acted in bad faith and should be subject to punitive damages, what action was there to cause them to change their minds?[2]

---

[2] Here is the letter in its entirety:

"Dear Mr. Smith:

"I received the draft of the First Amended Complaint which you have sent to me. I have read it and observe that it contains a number of allegations which do not accurately state the beliefs that Greg and I have.

"Neither Greg nor I will ever testify falsely or suggest as true something that we do not believe to be true, and we are sure you would not want us to do so. We understood that your

## 2. *Letter Two: The Rus Firm's Immediate Response*

That same day Randall A. Smith, one of the Rus firm's three name partners, faxed over a letter in response defending its position. It made these points:

—The Rus firm had never requested that the accountants testify falsely or verify discovery responses which they did not believe to be true, and indeed would never do so.

—The accountants and a lawyer from the Conkle firm, the accountants' own independent counsel, had reviewed and approved the original complaint.

—There is no need to have facts establishing defendant's liability to a moral certainty before asserting a claim.

—There were multiple claims entitling the accountants to policy limits of $3 million instead of merely $1 million, and, because the "Hill Williams 'empire' had begun to crumble at least by 1993, if not before," there was the

---

firm was going to show us why we were wrong to believe that Camico had treated us fairly. We have an open mind about the subject. We can be persuaded by information you might provide. To show an example where our belief would change: Suppose we had made an investment which had an 18% return compounded for the last six years. We might believe the investment had been a good one and be happy with the management. If we were then shown that the investment actually had returned 35% and the manager had stolen 17% each year and had concealed the theft from us and lied about that to us, we would probably believe that we had been cheated and defrauded. The same thing applies here. Camico was very open and considerate to us, said they were taking care of us, hired counsel, and even allowed us to hire our own attorney. You must show us why our view is incorrect. If you want us to agree with your allegations that Camico acted in bad faith and should be subject to punitive damages, what information is there to cause us to change our minds?

"We see this as a very serious matter. It is critical that you provide the information to us to show us why Camico is guilty of bad faith and how their actions or lack of action damaged us.

"You have sent us copies of the discovery which Camico sent to you. We understand that it is our obligation to state truthful discovery responses under oath. However, we will not verify discovery responses which we do not believe to be true. We will, per our telephone conversation of January 19, 1999, deliver to you all documents related to the Hill Williams mess. You have gotten most of the documents in discovery in the Daff cases. If there are other documents [*sic*] which you believe are needed, we will cooperate in making our records available. We cannot spend our time searching through records and you said that your staff would do that.

"This is a busy time of year for accountants and we hope you understand that someone cannot send us documents at the very last minute and expect us to drop everything to review, correct and sign it. With adequate and timely communication, I am sure that we can work together to conclude this matter and I appreciate the fact that you recognized these concerns. This letter is to confirm our conversation of January 19th.

"We will deliver our records to you by Friday, the 22nd, or Monday the 25th.

"If you have any questions or need something done by us, please call."

possibility that malpractice policies from 1992–1994 should have been available to cover the suit against the accountants as well as the 1995 policy.

—Smith wanted to speak to the accountants the next day about their letter because of the imminency of the deadline to file the first amended complaint, and he " look[ed] forward to working cooperatively with" the accountants "in the future to bring the above case to a successful conclusion."[3]

---

[3] Here is the letter in its entirety, boldface in the original:

"Dear Mr. Goodrich:

"This letter is in response to your letter of January 20, 1999 which I received via telecopier this afternoon.

"As I am sure you can understand, I was surprised at both the tone and content of your letter. This firm has never requested that you testify falsely or verify discovery responses which you do not believe to be true, and would never do so. You know that we have never made any such request and even acknowledge as much in your letter ('we are sure you would not want us to do so . . . .'). Thus, I was both shocked and disappointed to receive your letter.

"The original complaint was filed in this matter on October 30, 1998. Prior to the filing you and Bill Conkle reviewed and approved the filing of that document and made numerous changes to it. Cal Accountants Mutual Insurance Company ('CAMICO') then demurred to the original complaint raising various alleged legal deficiencies, and we prepared a proposed first amended complaint addressing those alleged deficiencies. The facts plead in the proposed first amended complaint, and the legal relief sought in the first amended complaint, do not differ substantially from those plead in the original complaint **which you reviewed and approved**.

"Your letter seems to suggest that you must have facts establishing a defendant's liability to a moral certainty before asserting a claim. That, of course, is not what the law provides. You are not required to effectively prove your case against CAMICO before pursuing it. Rather, based on the facts known to us we are permitted to make allegations against CAMICO (including allegations based on information and belief as contained in the first amended complaint), and are entitled to seek, through discovery, facts and evidence establishing those allegations. [FN 1. For example, you obviously cannot be expected to have first hand personal knowledge proving that CAMICO had an established policy or practice of treating its other insureds as you were treated. Further, the best evidence of CAMICO's motives in making its coverage decisions will be the testimony of the CAMICO witnesses and the documents in CAMICO's files. We can only obtain that evidence through the discovery process.] That is what we intend to do in this case as in any other case.

"Your view that CAMICO was, 'very open and considerate to (you)' is not the issue in the action which we have filed on behalf of your firm. Rather, the issue is whether CAMICO could rightfully cap its coverage exposure at $1 million for all of the claims which were asserted against your firm arising out of the various services which you performed on separate and independent matters over a several year period. One of the contentions which we make in the litigation is that the limits of coverage in the 1995 policy to your firm should have been $3 million (as stated in the policy)—not $1 million (based on CAMICO's interpretation of 'multiple claims' as defined in the policy). That is ultimately an issue of fact and contract interpretation which the trier of fact will have to decide. Further, since the Hill Williams 'empire' had begun to crumble at least by 1993, if not before, there are issues of fact as to whether additional coverage should have been provided under other policies which pre-dated the 1995 policy, including the 1992, 1993, and 1994 policies. Again, those are issues which ultimately need to be determined by the trier of fact.

"Let me also briefly address your comments about your inability [to] 'drop everything' on short notice to review, correct or sign documents. As you know, I sent you the discovery from

### 3. *Letter Three: The Rus Firm's "Morning-After" Response*

The Rus firm did not wait for a reply to its faxed letter. Rather, the next day it sent another letter, from a different name partner (Ronald Rus instead of Randall Smith), that was much different in tone and substance. Gone was the substantive defense of the complaints and the hopeful diplomatic ending. Gone was the willingness to continue to work on the case and finish the first amended complaint. The new letter made no attempt to justify the firm's position on the substance of the bad faith suit, other than to point to the fact that the accountants themselves had reviewed the allegations made in the original complaint. Here are the salient points of that second letter:

—The accountant's first letter had contained "outrageous suggestions" that the Rus firm "had somehow requested" false allegations or false discovery responses.

—The accountant's first letter "necessitate[d]" the Rus firm's immediate withdrawal as counsel. The accountants had made "false claims and inferences" which raised "an actual and irreconcilable conflict."

—The accountants were reminded of the need to continue the lawsuit under the terms of their settlement with Trustee Daff (whom the Rus firm was still representing) and if they didn't they would face a $40 million judgment.[4]

CAMICO, as well as CAMICO's Demurrer weeks ago—when those documents were received. It was only a few days ago that I received a voice mail message from you indicating that you had been quite busy and/or out of town and had not had a chance to look over those documents.

"Please give me a call tomorrow, so that we can discuss your letter, and mine, further. CAMICO has granted you an extension through this Friday, to file a first amended complaint. Thus, I would like to address any remaining issues on that document tomorrow and get it filed ahead of time. As you already know, CAMICO has also extended your discovery response dates until February 10, 1999.

"I trust that I will not be required to respond to any additional letters like your letter of January 20th, and look forward to working cooperatively with you in the future to bring the above case to a successful conclusion."

[4] Here is the letter in its entirety, all emphasis in the original:

"Gentlemen:

"I have now had a chance to review Roy Goodrich's letter to Randy Smith of this firm which Roy sent yesterday afternoon. I have also reviewed Randy's response which was sent yesterday afternoon responding to Roy's outrageous suggestions that this firm had somehow requested that Roy or Goodrich, Goodyear & Hinds ('GG&H') make false allegations or provide false discovery responses. After considering the content of Roy's letter further, we have come to the conclusion that his letter necessitates this firm's immediate withdrawal as counsel.

"As indicated in Randy's response of yesterday afternoon, **each of you reviewed in detail, agreed with and approved every factual allegation contained in the original complaint which was filed against Cal Accountants Mutual Insurance Company ('Camico')**. The

### 4. *Letter Four: A Plea From the Accountants for the Rus Firm to Remain on the Case*

The very next day, the accountants responded to Ronald Rus's letter, pleading with the Rus firm *not* to withdraw. The accountants insisted that they had always cooperated with the Rus firm and intended to continue cooperating with the firm. They had no desire to change attorneys. "We wish to continue to satisfy our obligation under the settlement to prosecute the lawsuit against" the malpractice insurer. They asked the Rus firm to diligently pursue the case.[5]

---

proposed First Amended Complaint which was sent to you for review and approval contained minor proposed amendments responding to alleged legal deficiencies raised in Camico's Demurrer, and frankly pled **no new facts**. It is therefore shocking, to say the least, to receive Roy's letter.

"This firm cannot continue to represent GG&H since it is apparent that GG&H is intent not on prosecuting the claims you have agreed were held by GG&H against Camico (as required by the terms of the Court approved settlement between Charles Daff ('Mr. Daff') and GG&H), but rather is intent on creating a false record. The false claims and inferences made by Mr. Goodrich raise an actual and irreconcilable conflict and require this firm's immediate withdrawal. Enclosed you will find two proposed Substitution of Attorney forms, one providing for Mr. Conkle's substitution as counsel, and the other providing for GG&H to appear in pro per.

"The settlement agreement between Mr. Daff and GG&H nonetheless requires that GG&H prosecute its action against Camico. Mr. Daff expects that GG&H will fulfill its obligations under that agreement.

"Please advise me or Randy Smith today as to which Substitution of Attorney form will be executed. If this firm is not promptly relieved as counsel, it is our intention to bring on a motion to be relieved.

"Please note that there are upcoming response dates as Randy has previously advised Roy. The First Amended Complaint is technically due to be filed by tomorrow. If it is not filed Camico could presumably reset its demurrer to the original complaint for hearing, and ask the Court to sustain the Demurrer without leave to amend. In addition, GG&H's discovery responses are due on February 10, 1999. In light of Camico's prior extension (obtained at Roy's request) we do not anticipate that Camico would be willing to extend that deadline further.

"Your prompt response is expected."

[5] And, lastly, this letter in full:

"Dear Mr. Rus:

"This letter follows the phone call I had with Randy Smith yesterday, your letter to me and the phone call I had with Randy Smith and you. Your suspicion that we have not been cooperating with your firm to pursue the case against CAMICO and will not cooperate is unfounded.

"Your firm informed us that it saw a meritorious case against CAMICO which should be brought. Your firm prepared the complaint and has been prosecuting the case. We have cooperated with your efforts. You suggest that we should change attorneys. We see no reason to change the attorneys and have not signed the substitution forms you sent to us.

"We wish to continue to satisfy our obligation under the settlement to prosecute the lawsuit against CAMICO. Please make sure that this case is diligently pursued."

## C. The Rus Firm Withdraws, Opposed

The smooth words from their clients did not turn away the lawyers' wrath. One week later the Rus firm moved to be relieved as counsel based on a "break-down in communications." The legal basis of the motion was rule 3-700(C)(1)(d) of the Rules of Professional Conduct, which provides that an attorney may request permission to withdraw if the client "by other conduct renders it unreasonably difficult for the [attorney] to carry out the employment effectively."

The papers on the withdrawal motion presented a remarkable contrast. The moving papers were short and conclusory. The points and authorities were less than nine paragraphs total. The only evidence supporting the motion was Ronald Rus' lone declaration, which itself consisted of less than one page with only three substantive paragraphs, and only one paragraph dealing with the reason for withdrawal. In full that paragraph only said, "Because of the break-down in communications between RMWS and GG&H, this firm cannot effectively represent GG&H in this matter." The nature of "the" breakdown in communications was not specified. Ironically, the points and authorities supporting the motion had intimated something more: *"As is more fully set forth* in the Declaration of RONALD RUS, GG&H and RMWS have experienced a break-down in communications such that RMWS cannot effectively represent GG&H." (Italics added.) But the declaration did not live up to the promise: The only "fully" setting forth in the declaration was the one sentence we have already quoted.

In contrast to the minimalist moving papers, the accountants' opposition to the withdrawal was, if not voluminous, about an inch thick. It consisted mostly of the documents telling the story up to that point. The opposition points and authorities argued the substantive merits of the ostensible reason for withdrawal, asserting that there had been no breakdown in communications.

In their reply papers the Rus firm indicated no willingness to confront the anomaly that the accountants said they *wanted* the Rus firm to represent them and were willing to cooperate with the litigation. Rather, the reply failed to discuss the supposed breakdown in communication in any detail. The points and authorities announced that the Rus firm had not "broadcast the details of the underlying dispute with its client," described the "break-down in communications" referenced in its moving papers as "simply a euphemism for the more detailed breakdown in the attorney-client relationship" which the firm said it was "precluded from describing in detail," and explicitly refused to say *how* the accountant's January 20 letter had caused that breakdown. ("Again, RMW&S will refrain from addressing the specifics of the January 20th letter

further . . . .") All the reply papers said was a conclusory, "RMW&S submits that in the face of that letter it had, and has, no alternative but to withdraw as counsel." Indeed, there was no way the Rus firm wanted to engage its clients in a "dialogue" as to the alleged breakdown. ("RMW&S intends to honor its ethical and attorney-client obligations and will resist the temptation to engage GG&H in such a counterproductive dialogue.")

The Rus firm argued that its own unilateral dissatisfaction with the relationship was by itself sufficient to justify rending it asunder. It pointed to the accountants' written agreement that in the event the Rus firm "in its sole judgment" determined it could no longer "provide representation" of the accountants, the accountants would "cooperate and substitute a new counsel." As legal authority the reply papers cited *Heple v. Kluge* (1951) 104 Cal.App.2d 461 [231 P.2d 505] (*Heple*), which had allowed some appellate attorneys to withdraw from a case where their clients had complained about the way a case was being handled.[6]

The motion was granted. The trial court signed off on an order prepared by the Rus firm, reciting, "there was good cause to grant the Motion," though, in parallel with the moving and reply papers, not mentioning in any detail what that "good cause" was. For the moment, the Rus firm disappeared from the action. They had done thousands of hours of work on the general case, but less than a hundred as the attorneys for the accountants.

### D. The Accountants Prevail Against Their Malpractice Insurer

#### 1. *But First They Had to Find New Counsel*

The first task for the accountants was to find new counsel for the bad faith case against the malpractice insurer. The task proved difficult. Since the Rus firm had originally been retained on a contingency fee agreement, any prospective new group of lawyers would know that they would face a lien claim from the Rus firm in the event of any success at all. On top of that, the

---

[6] The reply papers hardly told the full facts of the *Heple* case, even though it is an uncommonly short opinion. In a word, the breakdown in *Heple* was of a different order of magnitude from whatever had happened between the accountants and the Rus firm. In *Heple*, the court noted there had been "constant disagreement about fees to be paid and the conduct of the litigation," with the added irritation that the clients had refused a settlement offer recommended to them by their attorneys. (See *Heple, supra*, 104 Cal.App.2d at pp. 461–462.) *Heple* has been cited only once in a published opinion in the half-century it has been on the books, and that for the proposition that an "apparent *total* breakdown" in the relationship between client and attorney is "adequate grounds" for a trial court to relieve an attorney. (See *People v. Cohen* (1976) 59 Cal.App.3d 241, 249 [130 Cal.Rptr. 656], italics added.)

facts in the bad faith file were necessarily complex, as they involved the machinations of the Hills Williams empire over the period 1992–1995 and whether any such machinations would implicate malpractice insurance policies during that period.

The accountants ended up with the most likely candidate, the Conkle firm who had been advising them all along, but only on a hourly basis. So on May 11, 1999, the Conkle firm filed the first amended complaint after making a few superficial modifications to the version prepared by the Rus firm.[7]

### 2. Who Promptly Fought a Summary Judgment Motion

The bad faith case finally having reached a crossroads, the malpractice insurer moved for summary judgment on the complaint, seeking to establish that there was no coverage under any of the other insurance policies. The Conkle firm, representing the accountants, moved for summary adjudication on the same facts, contending that coverage existed under at least one other policy year.

And then a strange thing happened. The accountants won. The trial judge denied the insurer's summary judgment motion and granted summary adjudication in part to the accountants.

### 3. And Obtained $1.875 Million In a Settlement

The tables having turned, the malpractice insurer made settlement overtures. After negotiations conducted primarily between the Conkle firm and the malpractice insurer, the parties ultimately settled for $1.875 million. According to the terms of the original settlement agreement between Trustee Daff and the accountants, Trustee Daff received about $955,000, the accountants received $100,000, and $819,000 was reserved for attorney fees.

In view of the upcoming battle over the $819,000 reserved for fees, the Conkle firm was replaced with the accountant's current counsel, Phillip K. Fife. It is noteworthy that of the Trustee's $955,000 share, the Rus firm *as the Trustee's attorneys* already has been paid over $400,000. If the firm were to prevail completely on its quantum meruit claim for 43 percent of the $1.875 million settlement, the Rus firm would garner about $1.2 million, or two-thirds of the entire settlement.

---

[7] For some mysterious reason, a significant number of these changes *introduced* grammar and spelling errors where the language had previously been correct in the Rus firm's version. For example: "to *pay* the 15 percent interest" became "to *gay* the 15 percent interest"; "*the* Policies" became "*te* Policies"; and "*in* excess of $40 million" became "*io* excess of $40 million."

### E. The Fight Over the Settlement

The Rus firm filed a notice of lien against the proceeds of the settlement of the bad faith case for "an amount not less than $806,250," i.e., 43 percent of $1.875 million. This set the stage for the battle between the Rus firm and the Conkle firm and the accountants for the $819,000 reserved for attorney fees.

The Conkle firm struck first. It filed a declaratory relief action against the Rus firm to establish that it did not have an enforceable claim on the attorney fees. The Rus firm then filed a cross-complaint against both the Conkle firm and the accountants.

The Rus firm's cross-complaint not only defended its quantum meruit attorney lien claim, but went on the offensive against the Conkle firm. The Conkle firm, it was alleged, had interfered with the Rus firm's prospective economic advantage by inveigling the accountants to drop the Rus firm and writing the letter for them that precipitated the Rus firm's withdrawal. The causes of action against the accountants were stricken on the theory that they amounted to allegations of a civil conspiracy between lawyer and client under Civil Code section 1714.10 and there was no probability of prevailing. We deal with the appeal from the dismissal of those causes of action in an unpublished companion case (Nov. 24, 2003, G028909 [nonpub. opn.]).

### F. The Papers on the Summary Judgment Motion

That left only the claims for quantum meruit and declaratory relief outstanding. The Conkle firm and the accountants then separately moved for summary judgment.[8]

Much of our record consists of the moving papers for the summary judgment motions, and those moving papers consisted mostly of the source documents for the story up to now. The Rus firm's opposition was, like its papers on the earlier withdrawal motion, comparatively thin. The Rus firm revealed *no new facts* as to the reason behind the firm's umbrage with the January 20th letter from the accountants, though there was a little more elaboration on what it had previously said. Ronald Rus's declaration in opposition to the summary judgment motion stated that letter "directly inferred that the Amended Complaint drafted by RMS was forcing GG&H to give false testimony or suggest things that GG&H did not believe to be true." It also said of the letter that the accountants had stated they "had been treated

---

[8] They each joined each other's motion as well. The Rus firm considers the Conkle firm's joinder in the accountants' motion to be improper for failure to serve a separate statement in support of its joinder. There was clearly no prejudice to the Rus firm and the trial court properly overruled the objection.

fairly" by their malpractice insurer during the Trustee's action against them. And it treated the reader to a little more of Rus's own thoughts in reaction to the letter, though again couched in conclusory terms: "I reached the conclusion that GG&H's allegations as to perjury and statements supporting the validity of CAMICO's coverage position created an irreconcilable conflict for RMS' continued representation of GG&H in the CAMICO Action."

The conclusory nature of the Rus firm's position carried over into its points and authorities in opposition to the summary judgment motion. It relied on the trial court's boilerplate "good cause" finding in the earlier withdrawal motion, and asserted that "[t]he withdrawal was necessitated by the fact that GG&H had put RMS in a position where it could not zealously advocate the case on behalf of its client who was suggesting that RMS sought to have the client perjure itself or pursue an action which the client believed lacked merit." The firm's main legal theme was that there were triable issues as to the validity of the settlement agreement authorizing the accountants to prosecute the insurance bad faith action, and whether "the reasons behind RMS' forced withdrawal . . . constitute[d] justifiable cause entitling RMS to recovery of attorney's fees in quantum meruit." And in fact in oral argument, Ronald Rus asserted that whether the withdrawal was "permissive" or "mandatory" was a triable issue.

The trial court thought that it wasn't a triable issue at all, but a legal one, concluding that the reasons behind the withdrawal were not justifiable cause. There was no dispute about the facts, only a dispute about their "interpretation." The court concluded that the reasons were permissive and it was thus bound by *Estate of Falco, supra,* 188 Cal.App.3d 1004, to grant the motions. The Rus firm timely appealed from the ensuing judgment.

### III. DISCUSSION

#### A. Overview of the Right to Recover Despite Withdrawal

■ The rules on recovery after a separation between client and attorney in a contingency fee case depend on exactly who wanted out of the relationship and why. The simpler scenario is when the client unilaterally discharges the attorney—there is a bright line. If the client fires the attorney, the law is clear that the attorney may assert a quantum meruit claim against any recovery. (See *Fracasse v. Brent* (1972) 6 Cal.3d 784, 792 [100 Cal.Rptr. 385, 494 P.2d 9]; see also *Falco, supra,* 188 Cal.App.3d at p. 1013, fn. 8; *Hensel v. Cohen* (1984) 155 Cal.App.3d 563, 567 [202 Cal.Rptr. 85].) ■ The court in *Falco* stressed that our Supreme Court in *Fracasse* rejected any differential between cause or not—even an attorney discharged *with* cause " 'is entitled to recover the reasonable value of his services rendered to the

time of discharge.' " (See *Falco, supra,* 188 Cal.App.3d at p. 1013, fn. 8, quoting *Fracasse, supra,* 6 Cal.3d at p. 792.)[9] The rule makes perfect sense. As we recently noted in discussing the *Fracasse* case in another context, a client's absolute right to discharge an attorney in a contingency fee case allows the client, in effect, to confiscate the attorney's work. (*Jalali v. Root* (2003) 109 Cal.App.4th 1768, 1777 [1 Cal.Rptr.3d 689].) The corresponding right of the attorney to assert a claim for the value of his or her work only ameliorates that inequity.

■ The subject is more complex when the attorney leaves without having been discharged by the client. Any claim to a subsequent recovery depends on whether the attorney had "justifiable cause so as to permit a recovery of compensation." (See *Falco, supra,* 188 Cal.App.3d at p. 1015.) The one clear bright line rule established by case law to date is that if the attorney withdraws because of a good faith belief that the case is meritless, he or she has no claim on any eventual recovery. After all, by definition the attorney in that situation withdrew not anticipating any recovery in any event. (See *Hensel, supra,* 155 Cal.App.3d 563 [attorney withdrew when he could find no evidence on which to predicate defendant's liability; no recovery allowed]; *Falco, supra,* 188 Cal.App.3d 1004 [attorney withdrew when clients refused to accept settlement of what attorney believed was weak case; no recovery allowed].) One might call this the "dead-blank loser" rule after the description given of the case by the attorney in *Hensel, supra,* 155 Cal.App.3d at page 568. If the attorney withdraws because he or she has no faith in the prospect of recovery, then surely the attorney will never see any. Otherwise, as the law stands, the justifiability of the reason for withdrawal is dependent on the particular facts of the case. (See *Falco, supra,* 188 Cal.App.3d at p. 1015.)

The present case does not fall within the dead-blank loser rule. There is no hint in this record that the Rus firm ever believed that the accountants' case against the malpractice insurer would not yield a significant recovery. Indeed, much of its opposition to the summary judgment motions stresses that the firm had great faith in the bad faith action against the accountant's malpractice insurer.

■ But it cannot be maintained, as the Rus firm does, that when an attorney withdraws still believing in the meritoriousness of the cause ipso facto the attorney may still assert a claim in quantum meruit. The one does not follow from the other. The test, as stated in *Falco,* is whether the cause for

---

[9] One might postulate an exception for cases where an attorney is fired for unquestionably *unethical* conduct (like stealing from the client), but whether such an exception should be implied into the *Fracasse* rule may be left for another day.

withdrawal is *sufficiently* justifiable *so as* to permit recovery by the withdrawn attorney. Justifiability for withdrawal and subjective belief in the merits of the action are independent concepts.

At this juncture, as in *Falco*, an important distinction must be drawn. The law governing an attorney's right or duty to merely withdraw from a case—and be done with it for good—is a "different question" than an attorney's right to withdraw and then *later* recover. (See *Falco, supra*, 188 Cal.App.3d at p. 1007.) The *Heple* case, cited by the Rus firm in its withdrawal motion, illustrates the distinction. On significantly stronger facts than the case before us, *Heple* allowed *withdrawal* but gave no hint that the withdrawing attorneys could ever share in the proceeds of some eventual victory.

The law can afford to take a relatively permissive attitude toward withdrawals *qua withdrawals*. If attorney and client cannot agree, how can they litigate together? There is no need to unequally yoke a union when one of the parties clearly wants out.

But the right to recover in quantum meruit *after* withdrawal is a different matter, and one on which the law takes a more rigorous approach. ■ We may therefore, at the outset, reject the Rus firm's argument that the trial court's finding of "good cause" to withdraw allows it ipso facto to recover fees. Good cause to withdraw is not necessarily good cause to recover money obtained in a settlement after withdrawal. The "good cause" argument also rings particularly hollow here in light of the fact that it was the Rus firm itself that inserted the finding as sheer boilerplate based on a motion that was cryptic at best in specifying the "cause" at issue.

This appeal is thus not about whether an attorney who doesn't like the questioning tone of a letter from a client has the *right* to withdraw based on the provision in the rules of professional conduct allowing withdrawal when the client supposedly makes continued representation unreasonably difficult. It is about whether he or she has the right to permissively withdraw and then *later* assert a quantum meruit claim on any recovery obtained by a subsequent attorney.

### B. Mandatory Withdrawal for Ethical Reasons? No.

A core theme in both the two dead-blank loser cases, *Hensel, supra*, 155 Cal.App.3d 563, and *Falco, supra*, 188 Cal.App.3d 1004, is the sheer unfairness of attorneys benefiting from their own inconsistent positions—claiming money under a contract which requires them to work on a case and then not working on it. There are times, of course, when professional ethics

*require* a withdrawal. In such cases, the inequity inherent in the inconsistent position is offset by the countervailing ethical value affirmed by the withdrawal—there is no injustice in allowing recovery by the attorney later.

But even in those cases there is a gauntlet to run. *Falco* proffered a set of five requirements attorneys must meet if they claim an ethical compulsion of withdrawal. The most significant of the five are the first two, namely that (1) the withdrawal be truly *mandatory* under the professional rules and (2) the "overwhelming and primary" motivation be the desire to adhere to the professional ethical rules, as distinct from some private ulterior motive. (See *Falco, supra*, 188 Cal.App.3d at p. 1016.)[10]

In the case before us, the withdrawal for breakdown in communications was clearly not mandatory under State Bar rules. Rule 3-700 is divided into two parts, (B) for mandatory withdrawals and (C) for permissive withdrawals, and rule 3-700(C)(1)(d) is definitely in the permissive part.

Beyond that, *Falco* devoted some considerable discussion to whether a client's alleged failure to cooperate (in that case, a *Jalali*-style preference for a trial over what the attorney believed to be a good settlement) justified the withdrawal, and the answer was clearly no. (Compare *Falco, supra*, 188 Cal.App.3d at page 1010, with *Jalali, supra*, 109 Cal.App.4th at page 1774.) Despite the fact that there was "mutual animosity" between lawyer and client and, as here, a *successful* withdrawal motion "granted on the basis that the attorney-client relationship had completely broken down," the court was clear the withdrawal was not so justified as to merit fees. (See *Falco, supra*, 188 Cal.App.3d at pp. 1011, 1020.)

If, in *Falco*, a failure to cooperate based on rejection of a good settlement offer was not enough to come within the rule that a mandatory ethical withdrawal may still preserve an attorney's quantum meruit claim, a fortiori simply writing a letter containing some (to take the Rus firm's interpretation of the letter) insulting implications is not enough. Some clients do insult their

---

[10] The *Falco* court framed the five-part test in terms of what the attorney must show to recover if he or she claims that ethics compelled the withdrawal:

"Noting the difficulty facing a trial court in making a factual determination of an attorney's motivation, we nonetheless find an attorney's withdrawal in adherence to ethical mandates is justified, entitling counsel to recover attorney's fees in quantum meruit. But, the attorney has the burden of proof to show: (1) counsel's withdrawal was mandatory, not merely permissive, under statute or State Bar rules; (2) the overwhelming and primary motivation for counsel's withdrawal was the obligation to adhere to these ethical imperatives under statute or State Bar rules; (3) counsel commenced the action in good faith; (4) subsequent to counsel's withdrawal, the client obtained recovery; and (5) counsel has demonstrated that his work contributed in some measurable degree towards the client's ultimate recovery." (*Falco, supra*, 188 Cal.App.3d at p. 1016.)

attorneys, but mere insult is not one of the reasons for *mandatory* withdrawal listed in Rules of Professional Conduct, rule 3-700(B).

### C. Justifiable Permissive Withdrawal?

### No Again.

As we said, the rules governing quantum meruit claims when the attorney withdraws are a little more complex than when the client fires the attorney. In a footnote relied on by the Rus firm, the *Falco* court left the door open a little to allow attorneys to recover fees even in cases where their withdrawal is under the permissive, as distinct from mandatory, provisions of the State Bar rules. (See *Falco, supra*, 188 Cal.App.3d at p. 1016, fn. 12 ["We do not rule out the possibility of awarding fees to an attorney who withdraws under permissive withdrawal provisions of State Bar rules or statute."].) The court then hastened to add, however, that such cases required "heightened scrutiny." (*Ibid.* ["In cases involving permissive withdrawal it is within the discretion of the trial court, with heightened scrutiny consistent with the standards articulated here, to determine whether counsel's withdrawal was justified for the purpose of awarding fees."].)

Safe to say, then, that we do not have a simple binary test as would apply if the attorney were claiming an ethical mandate to withdraw (presumably under *Falco* if the attorney met the five elements, he or she would be entitled to proceed with the claim), but an even more fact-specific inquiry. The *Falco* court was thus willing to entertain the possibility that some permissive withdrawals might qualify for a quantum meruit claim later. It is equally clear, though, that the particular permissive withdrawal in *Falco* did not qualify.

The reason behind the justifiability rule is instructive. The reason fees are barred, as explained in *Hensel* and *Falco*, is the inequity of allowing lawyers to capitalize on their own voluntary actions in leaving clients lawyerless. The *Hensel* court opened its opinion by characterizing the withdrawing attorney's behavior as bet hedging, and closed by analogizing the attorney to the man who kills his parents and then asks for mercy as an orphan. (See *Hensel, supra*, 155 Cal.App.3d at pp. 564, 568–569.) *Falco* repeated the bet hedging metaphor, and pointed to an attorney's possible economic motivations in seeking to reduce his or her "own losses." (*Falco, supra*, 188 Cal.App.3d at p. 1016.)

To those thoughts let us add this gloss: To allow an attorney under a contingency fee agreement to withdraw without compulsion and still seek fees from any future recovery is to shift the time, effort and risk of obtaining

the recovery (economists would refer to these things as the "costs" of obtaining recovery) from the attorney, who originally agreed to bear those particular costs in the first place, to the client. The withdrawing attorney gets a free ride as to many of the headaches of litigation which he or she otherwise would have had to endure: answering the client's phone calls, showing up for depositions, responding to discovery, fending off summary judgment motions, preparing for trial, fending off in limine motions, picking a jury, fending off motions for nonsuit, judgment notwithstanding the verdict and new trial if he or she does win, and then, at the end of it all, protecting the fruits of victory by responding to an appeal. It is a very tough row which a contingency fee attorney originally agrees to hoe. Thus it is unassailably unfair to allow him or her to escape that labor absent the most compelling of permissive reasons—reasons that, as *Falco* indicated, must pass heightened scrutiny.[11]

Here, there is no way that the Rus firm's withdrawal can withstand regular scrutiny, much less the heightened scrutiny required by the *Falco* case.

We have described the withdrawal motion and the opposition to the summary judgment motion in unusual detail. Our purpose has been to demonstrate that the Rus firm never gave any factual reason justifying its withdrawal other than the contents of the January 20 letter.

In that regard we must note something that is conspicuously *not* in the record. It may be, to indulge in some out-and-out speculation for the moment, that the principals in the Rus firm sensed that the January 20 letter was a "set-up." Consider, for a moment, the mutual suspicion that client and attorneys probably had toward each other even after the settlement of the Trustee's litigation. The lawyers who had been suing the accountants for all they were worth were now representing them. There is an old saying that folks who bury the hatchet usually remember where they buried it, so the new lawyer-client relationship, born of the exigencies of earlier litigation, could hardly be expected to be a love feast.

The settlement thus entailed a certain risk for the Rus firm. Should the litigation "go south" (to use litigators' argot for "turn out disasterously") on the plaintiffs, the firm would have no reason to expect its new clients to be forgiving or cooperative in any subsequent malicious prosecution action or sanction request. The clients most certainly would seek indemnity based on the theory that the Rus firm was the driving force behind the meritless litigation: "Our lawyers made us do it."

---

[11] Indeed, as a matter of policy, any other rule creates perverse incentives. The first attorney to represent a client would have reason to do as little as possible and then jump on the hint of first client noncooperation to maximize recovery with a minimum of hassle.

But we, however, must confine our decision to the record now before us. It cannot rest on any such flight of imagination or defenses that "might have been." If the Rus firm had a good reason to avoid answering the clients' letter and for withdrawing (and for the moment we will assume for sake of argument that our "set-up" fantasy is such a good reason), it should have *told that to the trial court* in its opposition to the summary judgment motion, not stood implacable on the bare text of the January 20 letter.

But it did, and no triable issue of fact arises from that letter. It speaks for itself, and is a lot plainer than many insurance policies, the language of which courts regularly construe as a matter of law on summary judgment motions. If the letter was cipher for "we will sue you if we lose," the Rus firm offered no facts to raise the possibility that the parties were communicating in any such code. (Cf. *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1793 [22 Cal.Rptr.2d 206] [parol evidence appropriate to explain special meanings given words by contracting parties, but not appropriate to vary ordinary meanings of words].)

Having decided to take its stand on the actual English text of the letter, the firm must live or die on that text. And that text cannot *reasonably* justify withdrawal. Nothing expressly indicated *any* reluctance to actually cooperate. Moreover, the accountants had every right to write that letter. If your doctor wants to do surgery to remove some part of your body, you have every right to ask why. If your auto mechanic recommends an engine overhaul, you have every right to ask why. And if your lawyer thinks that you should sue your insurance company despite the good relations you have always had with it, you have every right to ask why.

Just looking at the text of the letter, the most uncooperative aspect of it is that the accountants expected the lawyers to do much of the legwork in the face of upcoming discovery requests. But that is often a lawyer's job.

And even if there was a mild hint of skepticism which might be teased out of a facially innocent request to have one's lawyers please be so kind as to explain *why* the case was meritorious, what's wrong with that? Why should clients have to tremble with fear if they ask any questions of their attorneys on the off-chance that their attorneys will feel insulted that they are not invested by their clients with a godlike trust? Why should clients have to worry that if they even ask a question which might indicate a little skepticism about a case that the attorney will drop their case, *despite* their subsequent and humbled entreaties?

Yet precisely that happened here. Indeed, it is telling that the Rus firm's *first* response reacted to the accountant's inquiry consistent with the language

used. Randall Smith's fax looking forward to working "cooperatively" with the accountants was a response precisely and reasonably calibrated to the accountant's letter.

The second letter, though, was pure overkill; the very speed with which it was sent was indicative of a new agenda: There is no other conclusion to draw but that the Rus firm at that point did not want to hazard the possibility of even a humbled retraction from the accountants. At that point the Rus firm wanted out of the case for its own reasons, independent of any lack of cooperation or break down in communications.

That conclusion is proved by the Rus firm's steadfast refusal to reconsider after the accountants did, in fact, plead them with to, in effect, pretty please come back. As the accountant's second letter made clear, the chastened accountants were quite willing to proceed with the case and cooperate with their lawyers. The Rus firm, however, would have none of it. Even though the Rus firm had the opportunity in the opposition to the summary judgment motion to explain why it rejected the accountant's peace offering, or to provide some other explanation for withdrawal beyond the bare words of the accountant's January 20 letter, it made no attempt. Indeed, throughout this litigation it has never attempted to explain why, given the *explicit* willingness of the accountants to cooperate in the litigation voiced by the accountants prior even to the *filing* of the withdrawal motion, its heart continued to remain hardened against its clients.

## IV. DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

O'Leary, J., and Moore, J., concurred.

A petition for a rehearing was denied December 19, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 24, 2004.