[No. G029474. Fourth Dist., Div. Three. June 9, 2003.]

FARIDEH JALALI, Plaintiff and Respondent, v.
WALTER H. ROOT III, Defendant and Appellant.

**COUNSEL**

Root & Feinstein and Walter H. Root for Defendant and Appellant.

Johnson & Grobaty and Michael J. Grobaty for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.—**

I

Farideh Jalali sued her former employer for racial discrimination and sexual harassment. Her attorney, Walter H. Root III, brought the case to the first phase of a bifurcated trial. In that phase he succeeded in convincing the jury to award compensatory damages of $750,000. The jury also found the necessary malice, fraud or oppression to justify punitive damages. With the second phase of trial and punitive damages looming, the employer made a settlement offer of *$2.75 million* for all claims, conditioned on confidentiality. Jalali accepted the offer.

Settlement, from a plaintiff's point of view, means avoiding a multitude of risks, particularly when large sums of money are involved, and for most people, $2.75 million is still real money. Consider the ordeal that Jalali saved herself by accepting the offer. She did not have to worry that the trial judge, by granting a judgment notwithstanding the verdict, would completely undo her win. She did not have to worry that the trial judge, by granting a new trial motion, would force her to try the case again. She did not have to worry that an appellate court might do the same by deeming her evidence insufficient, or by saying that some procedural error in the trial required a rerun. Further, settlement eliminated the risk that the California Supreme Court might have taken the case, either because it implicated an important question of law or because the appellate court's decision evidenced some discontinuity in the law requiring the high court to step in to secure uniformity. And on top of all of that, Jalali spared herself the problem of collecting on the judgment, including the risk that her employer might have filed for bankruptcy.

Nor should such risks be discounted. Consider the $2.75 million settlement just in relation to the $750,000 verdict for compensatory damages. It impliedly meant that the employer was willing to assume that the $750,000 award would stand, as well as an additional $2 million in punitives—a ratio of 2.66 punitive damages to compensatory damages. There is at least some authority suggesting that such a ratio is fairly close to the maximum possible that can be upheld under the best possible conditions for a plaintiff. (See *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 423 [93 Cal.Rptr.2d 60, 993 P.2d 388] (conc. opn. of Brown, J.) ["In the case of large awards, punitive damages should rarely exceed compensatory damages by more than a factor of three, and then only in the most egregious circumstances clearly evident in the record."]; *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, __ [123 S.Ct. 1513, 1524, 155 L.Ed.2d 585] [stating that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," and specifically noting a case where a punitive award of four times compensatory damages "might be close to the line of constitutional impropriety"].)

The record in the case before us contains Jalali's trial brief against her employer, so we have a glimpse of what was the basis of her case. Without going into too much detail, one could not say, in the words of Justice Brown's *Lane* concurrence, that the circumstances behind Jalali's claim were necessarily "most egregious." The villain was one particular manager who made racial slurs and sexual comments, but mostly outside of Jalali's presence. There was no quid pro quo sexual harassment; the supervisor never demanded sexual favors, nor did he engage in any sexual touching. His sexual harassment offenses were basically crude expressions to others of his obviously unrequited desire for Jalali. The ethnic epithets were made outside of Jalali's presence. Her basic complaint was that she was given an impossible quota to fill while required to do work for others. Her theory was that she, in essence, was being sacrificed for the greater good of the department because she was a Persian woman, and a non-Persian male would never have been put in that position. Without in any way condoning the actions of the manager or (inferentially) her employer, it is fairly easy to find examples where the racial discrimination or sexual harassment was clearly more egregious. (E.g., *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 126 [87 Cal.Rptr.2d 132, 980 P.2d 846] [service station manager routinely addressed Latino drivers (and only Latino drivers) as " 'motherfuckers' "]; *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 998 [47 Cal.Rptr.2d 478, 906 P.2d 440] [jail training officer lewdly and directly propositioned trainee, repeatedly touched trainee on legs and thighs, and demanded oral sex in order for her to " 'get off training' "]; *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 847 [77

Cal.Rptr.2d 12] [immediate supervisor regularly propositioned employee and placed hands on her breasts and buttocks while making sexually suggestive remarks]; *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1144 [74 Cal.Rptr.2d 510] [supervisor grabbed employee's buttocks]; *Lantz v. Superior Court* (1994) 28 Cal.App.4th 1839, 1842-1843, fn. 2 [34 Cal.Rptr.2d 358] [conduct alleged to include sheriff's summoning of employee to his house, where he greeted her in his underwear, sexually aroused, with a pornographic film on the television].) Our point is not to minimize Jalali's discrimination, but to note that in obtaining a large multimillion-dollar settlement—which is money *now*, not after *years* of briefs and appellate wrangling—her lawyer had done a very good job for her.

It is therefore quite remarkable that Root himself later became the defendant in this legal malpractice proceeding brought by Jalali. It is even more remarkable that the legal malpractice action resulted in a judgment against Root for about $310,000 for bad tax advice. Simply put, Jalali claimed that, before she accepted the $2.75 million settlement, Root told her that her taxes on the settlement would be "forty percent of your share," that is, Jalali's share after deducting Root's contingency fee. However, Jalali ended up paying taxes on the whole $2.75 million received, not just her portion after deducting her attorney's fee. The $310,000 was the difference between what Jalali expected to receive and what she actually retained, after taxes.

II

A

It is important to understand precisely the nature of Jalali's theory against Root. It is *not* that Root could have done better than $2.75 million.

The usual way by which disappointed clients demonstrate damages in legal malpractice actions is the "trial-within-a-trial" method, which is based on the premise that, had the attorney not fallen below the applicable standard of care, the client *would* have obtained a better result. (See generally Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood* (1998) 61 Temp. L.Rev. 1127, 1130.) The degree to which the trial-within-a-trial method is *required* of a plaintiff in a legal malpractice suit is open to question. That topic was thoughtfully addressed in *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820 [60 Cal.Rptr.2d 780]. The court noted the academic criticism, including Bauman's article, leveled against the method (*id.* at pp. 833-834), but ultimately concluded that, on balance, the trial-within-a-trial method "is the most effective safeguard yet devised against speculative and

conjectural claims . . . . It is a standard of proof designed to limit damages to those actually *caused* by a professional's malfeasance. Certainly to date, no other approach has been accepted by the courts." (*Id.* at p. 834, original italics.)

 Here, there is no need to wade into the academic thicket of whether a plaintiff must always use the trial-within-a-trial method to show damages for legal malpractice. It is enough to say here that because Jalali did not use the method against Root in this case, she proved no damages caused by his alleged malpractice.

But to truly understand the nature of the failure of proof of damages, we must first explain in a more detailed way the nature of Root's alleged malpractice and the precise way in which Jalali asserts she was damaged by it.

At Root's legal malpractice trial, Jalali did not even attempt to show that she could have held out for more than the $2.75 million, or, alternatively, obtained more from the jury. Indeed, as we have already indicated, that was unlikely in any event. Rather, her theory is that, had Root not given her a faulty prophecy of what the *tax* law would do, she would have rejected the settlement offer, and forced a trial in open court of the punitive damage issue, *even if it meant a lesser result.* Her loss was thus not monetary. It was psychic. It was the loss of the opportunity to lay her employer's dirty linen out for the world to see. It is the deprivation of *that right*—the right to publicly expose her former employer—that Root's alleged malpractice caused Jalali to lose.

Preliminarily, we do not address the general question of whether personal injury lawyers have any duty, under normal circumstances, to accurately apprise their clients of the tax implications of any recovery they might obtain for their clients. In *this* case, however, there is substantial evidence that we must accept on appeal that Root held himself out as particularly competent to give tax advice in the context of recoveries in discrimination cases. According to Jalali's testimony, he told her, "This is my field. I know what taxes are for discrimination cases." Root has not argued that he didn't have a duty to give Jalali accurate tax advice, and both sides have operated on the assumption that he did.

Further, we will assume, for purposes of this appeal, that Root indeed gave Jalali incompetent tax advice, even though the merits of Root's advice are open to debate: Root has at least three federal circuits and some critical commentary on his side. (See *Srivastava v. C.I.R.* (5th Cir. 2000) 220 F.3d

353, 363-364; *Davis v. C.I.R.* (11th Cir. 2000) 210 F.3d 1346, 1347; *Estate of Clarks ex rel. Brisco-Whitter v. U.S.* (6th Cir. 2000) 202 F.3d 854, 856 (*Estate of Clarks*); see generally Sheridan, *Trees in the Orchard or Fruit from the Trees?: The Case for Excluding Attorneys' Contingent Fees from the Client's Gross Income* (2001) 36 Ga. L.Rev. 283; Sager & Cohen, *How the Income Tax Undermines Civil Rights Law* (2000) 73 So.Cal. L.Rev. 1075, 1080-1083; Morse, *Taxing Plaintiffs: A Look at Tax Accounting for Attorney's Fees and Litigation Costs* (2003) 107 Dick. L.Rev. 405.)

Since it strikes most people as highly counterintuitive (a fancy way of saying unfair) that a civil rights plaintiff should not be able to either exclude the fees she pays her contingency-fee attorney from her gross income, or at least get a deduction for those fees, it is worth taking a small detour to understand the problem that got Root into trouble.

The culprit is the alternative minimum tax (Int.Rev. Code, §§ 55-59). The alternative minimum tax was originally designed to ensure that millionaires (back when millionaires were *really* millionaires) couldn't use itemized deductions and tax credits to shield themselves entirely from federal taxes. (See Maynard, *The Fruit Does Not Fall Far from the Tree: The Unresolved Tax Treatment of Contingent Attorney's Fees* (2002) 33 Loy.U.Chi. L.J. 991, 1010-1011.) However, it has metamorphosed into a terror for civil rights plaintiffs. (See Sager & Cohen, *How the Income Tax Undermines Civil Rights Law, supra,* 73 So.Cal. L.Rev. at p. 1078 ["We believe that the AMT's disallowance of deductions for attorney's fees in these instances is wrong as a matter of tax policy."].)

Taxation of civil rights awards is *normally* not a case of classic double taxation like corporate dividends—successful civil rights plaintiffs still get to deduct their lawyers' fees from their gross income on their *regular 1040.* The problem is that the alternative minimum tax doesn't allow for the deduction of legal fees incurred in the production of income like the regular 1040 does. Because the successful civil rights plaintiff must include 100 percent of his or her recovery in calculating the alternative minimum tax, but can't deduct the attorney's portion, the plaintiff winds up paying taxes on income that he or she never really had. That *is* double taxation—the winning plaintiff pays taxes on the same income which the attorney pays taxes on. If the attorney's fees are too high in proportion to the recovery, the results can be downright ludicrous. (See Morse, *Taxing Plaintiffs: A Look at Tax Accounting for Attorney's Fees and Litigation Costs, supra,* 107 Dick. L.Rev. at p. 499 [noting case of taxpayer who was left with a tax bill of $209,000, which was more than she got from the case after paying her attorneys].) Even those courts which have sided with the IRS and ruled against the

taxpayers have acknowledged the highly counterintuitive nature of the operation of the alternative minimum tax. (E.g., *Kenseth v. C.I.R.* (7th Cir. 2001) 259 F.3d 881, 884 (*Kenseth*) ["nothing in the background of the alternative minimum tax law indicates why attorneys' fees were, along with other 'miscellaneous expenses,' lumped in with tax preference items and denied the normal privilege"]; see also *Alexander v. I.R.S.* (1st Cir. 1995) 72 F.3d 938, 946 [recognizing that "because the amounts involved trigger the AMT and, thus, Taxpayer's deficiency, the outcome smacks of injustice"].)

Courts which have sided with the taxpayers in the area have not tried to rewrite the alternative minimum tax—the language is too tight—but rather resorted to *not* applying what in tax law is known as the assignment of income doctrine. Perhaps it should be called the "no-assignment-of-income doctrine," because its application works against the taxpayer. That is, you cannot avoid the progressivity of the tax laws by assigning your income to someone else (like your spouse—that was tried early on, and rejected, *Lucas v. Earl* (1930) 281 U.S. 111 [50 S.Ct. 241, 74 L.Ed. 731]). Another famous example—from which tax lawyers have derived the law's second most well-known fruit and tree metaphor—is that you cannot give the interest coupons from bonds to your son as a gift, and avoid including the interest received as gross income on your own return. It's still the fruit of the same income tree. (*Helvering v. Horst* (1940) 311 U.S. 112, 120 [61 S.Ct. 144, 149, 85 L.Ed. 75, 131 A.L.R. 655] ["the fruit is not to be attributed to a different tree from that on which it grew"].)

Courts which have taken the taxpayers' side have likened an attorney's right to receive a portion of a judgment to a partner's right to receive a share of income from a partnership (e.g., *Estate of Clarks, supra*, 202 F.3d at p. 857) and you do not have to pay taxes on your partner's income. Or, to use the dominant metaphor of the Sheridan article, there is more than one tree in the orchard and you aren't responsible for the fruit from the ones that aren't yours. (See Sheridan, *Trees in the Orchard or Fruit from the Trees?: The Case for Excluding Attorneys' Contingent Fees from the Client's Gross Income, supra,* 36 Ga. L.Rev. 283, 306-307.) There is a counterargument to that point, however, and it also has force: As the Seventh Circuit Court of Appeals asserted in *Kenseth*, a contingent fee agreement is "not an assignment" of income. (*Kenseth, supra,* 259 F.3d at p. 884.)

Well maybe. The whole area is tailor-made for a national moot court competition, since it involves a substantial split in the federal appellate courts, and ultimately turns on a common law doctrine (the "assignment of income" doctrine) on which reasonable minds could differ, depending on how you see contingency fee agreements. (See, e.g., Morse, *Taxing Plaintiffs: A Look at Tax Accounting for Attorney's Fees and Litigation Costs,*

*supra,* 107 Dick. L.Rev. at p. 500 ["Tax avoidance concerns, which are at the core of the assignment principle, hardly seem applicable here."]; Sheridan, *Trees in the Orchard or Fruit from the Trees?: The Case for Excluding Attorneys' Contingent Fees from the Client's Gross Income, supra,* 36 Ga. L.Rev. at pp. 309-310 [noting various reasons why application of the assignment-of-income doctrine to contingent attorney fees makes no sense].) It is enough to say here that for Jalali to have successfully excluded Root's fee from her gross income would have required nonmoot participation in the real world equivalent of such a competition at the highest possible level.

## B

Now let's return to the subject of damages proper. ■ Whatever the ultimate contours of the trial-within-a-trial doctrine, there is no doubt that a plaintiff in a legal malpractice action must still show a causal relationship between the legal malpractice and some "actual loss or damage" to prevail. (See *Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199-1200 [108 Cal.Rptr.2d 471, 25 P.3d 670].)

■ As Jalali made no attempt to show that she could have done better if she hadn't accepted the settlement, there is no causal relationship between her acceptance of the settlement and any *pecuniary* loss. Rather, Jalali's ostensible loss, as we have indicated, was the right to the legal process which might have made a public example of her employer, i.e., her loss was the loss of the right to the psychic satisfaction of *public vindication,* regardless of tangible recovery, and even that depended on a successful outcome to the litigation after any posttrial or appellate attacks by her employer.

Initially, let us not shrink from describing the implications of Jalali's theory of recovery. It is premised on the idea that clients have the unilateral right to gamble with the hard work of their personal injury lawyers, and, if push comes to shove, leave their attorneys in the financial lurch. The bad news for the plaintiffs' bar is that the premise is correct. ■ *Fracasse v. Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9] established that a client has the unilateral right to discharge his or her attorney with or without cause at any time—even on the courthouse steps—and the attorney only has a right to quantum meruit recovery, and only then in the event of the contingency contemplated by the contingency fee contract. No recovery, no fee, regardless of the work. But as Justice Sullivan pointed out in his dissent in *Fracasse,* the right means that clients have the power to stiff attorneys working under contingency fee contracts. (See *id.* at p. 802; cf. *Kenseth, supra,* 259 F.3d at p. 884 [in dicta, describing a client who terminates a contingent-fee contract with a lawyer as "in effect confiscating the lawyer's work"].)

██ Even so, given the nature of Jalali's theory, it is untenable to conclude that Jalali subjectively placed *no monetary value at all* on the satisfaction of having a public trial, even if it meant a recovery substantially less than $2.75 million, or perhaps even no recovery at all. If her entire purpose was the sheer joy of simply putting on a case in front of a jury in open court, she could have instructed her attorney to refuse all settlement offers. Rather, her theory is premised on classic economic comparison shopping: Her beef against Root is that he gave her *inaccurate information* as to the true value of one option (settlement), which meant she could not accurately compare that option with another (money be damned, go to trial).

Thus, implicit in her claim against Root is the premise that there was an amount at which Jalali would have settled (if she had been accurately told what her net recovery would be), and sacrificed the opportunity to publicly expose her former employer. That hypothetical amount was, *by definition*, larger than $2.75 million. Her real damage by virtue of her own theory was thus the difference between the net after-tax recovery that she would have garnered at the amount at which she would have settled given accurate tax advice information, and the net after-tax recovery she actually settled for because of the inaccurate tax advice. Because she never put on evidence that a recovery larger than $2.75 million was even possible, her proof of damages fails. (See *Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1057 [132 Cal.Rptr.2d 658] (*Orrick Herrington & Sutcliffe*) ["A plaintiff alleging legal malpractice in the prosecution or defense of a legal claim must prove that, but for the negligence of the attorney, a better result could have been obtained in the underlying action"].)

Let us put some flesh on these bones of abstraction. Jalali thought she was going to receive about $1 million after taxes and Root's fee, but only received about $700,000. Implicit in the jury's award of $310,000 is the notion that had the employer offered Jalali enough to net her that $310,000 *extra*, there would have been no damages from the bad tax advice, because Jalali would have gotten the amount she subjectively considered to be worth enough to give up the right to a public trial airing her employer's wrongdoing. Assuming a 40 percent marginal tax rate, that works out to about $500,000—i.e., it would have taken a settlement offer of $3.25 million to induce her to prefer cash to public vindication. Well, if that is the price which she put on her own right to a public trial, then she should have put on evidence that she could have recovered at least $3.25 million. She didn't, recognizing that the "value" of her case, as plaintiff's attorneys say, just wasn't worth *that* much. (Actually, it would make no difference if the value that Jalali had subjectively put on giving up the right to a public trial was only a few dollars more than $2.75 million. As long as she failed to present

evidence of even the possibility of obtaining more than that sum, she failed to prove damages.)

Furthermore, there is authority on which to conclude that it is not even possible for a court to value the loss of the intangible psychic satisfaction of public vindication. (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 801 [101 Cal.Rptr.2d 167] ["the value to a particular plaintiff of public vindication (or, conversely, the negative value of confidentiality) is so highly subjective and elusive that no court can determine its monetary worth"]; *Valentino v. Elliott Sav-On Gas, Inc.* (1988) 201 Cal.App.3d 692, 699 [247 Cal.Rptr. 483] [valuation of unfiled bad faith claim against defendant's insurer "would require the court to engage in wild speculation bordering on psychic prediction"].)

We need not, and do not, go so far as to follow a hard and fast rule that public vindication can never be valued by a court in any context. (*Barella* involved a settlement offer made pursuant to section 998 of the Code of Civil Procedure, so it may not be apposite in any event.) Here it is enough to note that Jalali did not prove any damages under the logical implications of her own theory.

## C

■ Jalali's tack in the face of an undisputed lack of evidence that the "value" of her case in terms of settlement or recovery after judgment did not exceed all that Root milked out of it is an argument based on the premise that Root intentionally violated his fiduciary duty as an attorney. It goes like this: Root knowingly gave false tax advice for his own benefit—if Jalali had exercised her right to a public trial, Root would have been paid later, possibly, and might not have gotten anything for his services in the event of a successful posttrial attack. (At the very least the time and effort of defending a $2.75 million judgment from posttrial attack would have been a significant opportunity cost to him.) Root thereby violated his fiduciary duty to Jalali, and therefore Jalali was entitled to "benefit-of-the-bargain" damages measured by her disappointment (our word, not hers, but it best describes the substance of what she sought by way of damages from Root) in her *net* recovery.

The premise of the argument fails. It cannot be inferred that because Root "was aware of the onerous tax ramifications" of the alternative minimum tax (as Jalali's brief puts it) or even that he himself would have benefited from the settlement—that he violated his fiduciary duty. As to the benefit to Root himself, all contingency fee lawyers benefit from large recoveries for their

clients and the evidence is undisputed that Jalali's preference for a public trial if her net recovery did not reach X dollars was never communicated to Root. On top of that, on this record the settlement was the likely maximum that could have been wrung out of the case. Root can hardly be faulted for presuming that his client would rather have hard cash than a public trial.

Jalali says that Root's perfidy was established because the "virtual consensus among all experts" in the case indicates that Root's advice was erroneous. That is silly; even if all the experts did agree that Root's advice was straight-out erroneous (which they didn't—Root's experts merely admitted that he should have added that the law was unsettled). Experts do not definitively ascertain law; at best they can only predict what judges will do. If Jalali lived in Ohio (the Sixth Circuit), Texas (the Fifth Circuit), or Georgia (the Eleventh Circuit), her tax accountant could have confidently excluded Root's contingency fee from her gross income even under the alternative minimum tax, and it would be the IRS that would be appealing all the way to the United States Supreme Court.

Of course, for a taxpayer living in the Ninth Circuit Court of Appeals, the decision to include an attorney's contingent fee in gross income and then sue the attorney for malpractice rather than fight the IRS all the way to the federal Supreme Court is an intelligent strategy call. It is easier to beat up a contingency-fee lawyer who was well paid for his services in front of a state court jury than it is to win against the IRS in federal court. (That said, we express no opinion on Root's argument that Jalali was required to do it the hard way and fight her battle all the way through the federal courts before she could bring her malpractice claim.) But the rationality of that decision cannot obscure the fact that Root had enough law on his side to preclude the conclusion that he *deliberately* gave "false" tax advice. As we have noted, even those courts who have sided with the IRS recognize the anomaly in the alternate minimum tax's treatment of legal fees incurred to generate personal injury recoveries. The *Kenseth* court did attempt an apology for the result by noting there that the settlement of an age discrimination case presumably replaced lost income, and normally one cannot deduct many of the expenses of producing that income, such as commuting. (*Kenseth, supra,* 259 F.3d at p. 884.) But the *Kenseth* court did not deal with the nature of punitive damages (at most only $750,000 of the $2.75 million here could be said to replace lost income) and in any event it also noted that "As an original matter, in taxation's Garden of Eden, it would indeed be difficult to think of a reason why Kenseth should have been denied the normal privilege of deducting from his gross income 100 percent of an expense reasonably incurred for the production of taxable income." (*Ibid.*) The real problem is that back in 1969, the Congress that wanted to prevent very rich people from

escaping taxes by loading up on deductions (and there were a lot more deductions in those days) didn't have the prescience to see that they were creating a monster that would ravage civil rights plaintiffs who obtain large recoveries. Chalk another one up to the law of unintended consequences.

## D

Because we conclude that Root did not violate his fiduciary duty, we do not address the more problematic question of whether "benefit-of-the-bargain" damages would have been appropriate *if he had*. ■ Our decision as to fiduciary duty also technically obviates another basis for upholding the award, which is a quasi-contractual money had and received claim. The jury awarded Jalali $248,160 on this cause of action, but made it clear in a special finding that the money was to be included in the $310,000 malpractice award. The award is supported in Jalali's respondent's brief solely on a fraud theory, and, as we have just concluded, there was no fraud.

However, several months after the respondent's brief was filed, Division Four of the First Appellate District handed down *Orrick Herrington & Sutcliffe, supra,* 107 Cal.App.4th 1052, a case which, in a petition for rehearing, Jalali stresses should allow her to keep at least $248,160 of the $310,000 on the theory that she had an "independent" quasi-contract action against Root. As of this writing, *Orrick Herrington & Sutcliffe* is not final. Given the possibility, however, that it will remain on the books, we take this opportunity to explain why the case does not support Jalali's quasi-contract claim.

Essentially, Jalali cites *Orrick Herrington & Sutcliffe* for the proposition that where an attorney's fee exceeds the value of his or her services (as would be the case when the attorney commits malpractice), the client can get at least a portion of the fee back on a quasi-contract claim. And regardless of whether the client has sustained any damages from the malpractice.

No. *Orrick Herrington & Sutcliffe* cannot be read for such a blanket, and untenable, proposition. Jalali's reading of the case would put the courts in the business of rewriting attorney-client contracts anytime a client was dissatisfied with the "value received," even when malpractice had not been committed.

An actual reading of *Orrick Herrington & Sutcliffe* shows that the case stands for far less than Jalali would have us believe it does. The case arose in the context of alleged malpractice committed by an attorney handling the divorce of a very wealthy client. The attorney did not include certain terms

in a property settlement agreement done in the wake of a two-day mediation session, thinking it was only a "term sheet." Unexpectedly, however, the family law court decided that the agreement was fully enforceable ás written. (*Orrick Herrington & Sutcliffe, supra,* 107 Cal.App.4th at p. 1055.) The client then spent large sums in an unsuccessful quest to undo the settlement. (*Ibid.*) It was that money—the money spent on legal fees trying to undo the result in the underlying litigation—that the client sought in his malpractice claim, as well as a contract claim. As in the case before us, the client was never able to show that he would have done better in the underlying case absent his first attorney's malpractice.

After an unsuccessful summary judgment motion, the first attorney sought writ relief. Almost all of the opinion is devoted to demonstrating that because the client did not show he could have obtained a more favorable result in the underlying action, he had, absolutely, no *tort* claim for legal malpractice. (See *Orrick Herrington & Sutcliffe, supra,* 107 Cal.App.4th at pp. 1057-1060.) Only at the end of its discussion, by way of briefly explaining why it was not having the entire case dismissed, the court, without elaboration save for one footnote, summarily stated that the client had produced "sufficient evidence to proceed with his contract claims." (*Id.* at p. 1061.)

But that one footnote is important. It tells us the nature of the contract claims which the court was allowing to survive the summary judgment.

The footnote follows an otherwise unremarkable statement in the text to the effect that "overpayment for services is contract damages." (*Orrick, Herrington & Sutcliffe, supra,* 107 Cal.App.4th at p. 1060.) It is unremark-able because it is almost a self-evident proposition. If, for example, after your divorce is over you accidentally write a check to your lawyer (who you agreed to pay for on an hourly basis) for more than you actually owe, *of course* you have a claim for the balance if he or she refuses to return it to you. The footnote, however, goes on to indicate that what the court is talking about are "fees paid to a second attorney to correct the first attorney's error." (*Id.* at p. 1060, fn. 5.) That is—to use the context of the facts in *Orrick, Herrington & Sutcliffe* themselves—if your first divorce attorney bungles a settlement, the money you pay the second attorney to correct his error *in the underlying case* can be the basis for a quasi-contract claim for overpayment.

That is the most that can be wrung from *Orrick Herrington & Sutcliffe.* It hardly stands for the idea that you can substitute a contract claim for a malpractice tort claim if your tort claim is not viable. In fact, the case itself warns of the tendency to circumvent the need for actual malpractice damages

just because the attorney was paid. (See *Orrick Herrington & Sutcliffe, supra,* 107 Cal.App.4th at p. 1058.)

In the case before us now, Jalali has paid no fees to correct any "error" of Root's. She did not, for example, to follow through with the parallel to *Orrick Herrington & Sutcliffe,* hire a new attorney to undo the settlement agreement so she could have a shot at obtaining more money—or, more tellingly—even just to have her moment of public vindication regardless of outcome. She didn't hire tax lawyers to fight the IRS on the problem of the taxation of civil rights awards.

No, in substance, Jalali's quasi-contract claim was merely a restatement of her tort malpractice claim. It was not independent of it—in fact, as shown by the heavy reliance on the fraud theory to support it in her respondent's brief, it was inextricably intertwined with it. The amount of Root's fee (which the jury thought should be reduced by $248,160) was only attacked because of Root's malpractice, not because he kept more than the contingency fee contract allowed. Indeed, the jury itself treated it as a species of malpractice: When specifically asked whether it intended to award Jalali both the malpractice amount ($310,000) and the quasi-contract amount ($248,160), the jury said no—it was *not* a separate award.

Finally, we would note that Jalali's "quasi-contract" claim for money had and received fails when considered under classic contract doctrine. The rule is that "[u]ntil an express contract is avoided," there cannot be an implied contract, which is "essential to an action on a common count." (*Lloyd v. Williams* (1964) 227 Cal.App.2d 646, 649 [38 Cal.Rptr. 849].) If a "plaintiff cannot return the benefits conferred under the express contract the action for money had and received will not lie." (*Ibid.*) Here, there is no way that Jalali could undo the express contingency fee agreement and give back the benefits she received. She hardly wants to return her share of the $2.75 million which Root obtained for her.

### III

The portion of the judgment appealed from—the $310,000 for the bad tax advice as well as the $248,160 quasi-contract award for the same bad tax advice—is reversed, with directions to enter a new judgment in Root's favor. Root shall recover his costs on appeal.

One housekeeping matter: As indicated earlier, portions of the record indicating the nature of the underlying case made it into the appellate record before this court. Those included, as mentioned, Jalali's trial brief against

her employer, plus the settlement agreement with her employer. Confidentiality was an important term of that settlement. Jalali's employer was willing to pay what was, in effect, a confidentiality premium to keep its identity and the details of the action against it secret. Rather than risk issues arising in the future as to whether any of the parties' conduct in the malpractice action against Root or in this appeal violated that confidentiality agreement, we will take the prophylactic step of ordering the record sealed pending further order of this court, application showing good cause, or, of course, order from a higher court.

Rylaarsdam, J., and O'Leary, J., concurred.

A petition for a rehearing was denied July 8, 2003, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied September 24, 2003.