[No. B182444. Second Dist., Div. One. July 31, 2006.]

Estate of DAN K. STEVENSON, Deceased.
KENNETH G. PETRULIS, as Administrator, etc., Petitioner and Appellant,
v.
WILLIAM C. WILKS, Objector and Respondent.

## Counsel

Goodson & Wachtel, Edward W. Wachtel; Orren & Orren, Tyna Thall Orren and Lowell H. Orren for Petitioner and Appellant.

Law Offices of Deborah F. Birndorf and Deborah F. Birndorf for Objector and Respondent.

## Opinion

**MALLANO, J.**—Under the Probate Code, an attorney for the administrator of an estate may be paid for extraordinary services under a "contingency fee" agreement if the trial court approves the agreement after a noticed hearing. (Prob. Code, § 10811, subd. (c).) The trial court may dispense with notice for "good cause." (*Id.*, § 1220, subd. (c).)

In this case, the trial court approved an agreement entitling counsel to attorney fees based on hourly rates and the total number of hours worked. The trial court dispensed with notice of the hearing and sealed a portion of the record so that creditors of the estate would not learn about the fee

agreement until after they had concluded settlement negotiations with the estate.

Counsel managed to resolve most of the creditors' claims through settlement, reducing about $12 million in original claims to $1.7 million in court-approved settlements. Counsel also obtained about $700,000 in payments, resulting in an estate with a negative net worth of $1 million. Pursuant to the approved agreement, the administrator petitioned the trial court for approximately $1.25 million in attorney fees.

Upon learning of the fee petition, a creditor objected to the agreement on the ground that it left nothing for creditors. The trial court decided not to award fees pursuant to the agreement and instead awarded $200,000.

The administrator appeals the trial court's order, arguing that counsel was entitled to an award under the agreement. We conclude that the trial court did not abuse its discretion because the agreement was not a "contingency fee" agreement within the meaning of the Probate Code, and the trial court erred in dispensing with notice of the hearing. Further, the fee award was just and reasonable under the circumstances. We therefore affirm.

## I

## BACKGROUND

On August 17, 2001, Dan Stevenson killed himself. On January 2, 2002, appellant Kenneth Petrulis was appointed administrator with will annexed. Letters of administration issued two days later. Petrulis, an attorney, chose the firm of Goodson & Wachtel (Goodson), where he worked, to represent the estate. The trial court approved a stipulation providing that Petrulis would not share in Goodson's attorney fees, and Goodson would not share in Petrulis's commissions.

In the first half of 2002, Petrulis served notice of the proceedings on creditors. Numerous claims, totaling more than $12 million, were filed. Several creditors requested special notice of the proceedings. (See Prob. Code, § 1250; all further statutory references are to the Probate Code unless otherwise indicated.)

On March 15, 2002, Petrulis filed a petition to establish the estate's ownership of property. The petition alleged that Stevenson had been insolvent for the last 20 years of his life; he had borrowed funds from several creditors

(lenders), often using the funds from one lender to repay funds borrowed from another lender. Stevenson had purchased one or more life insurance policies naming some of the lenders as beneficiaries, who had received policy proceeds after his death. The payment of those proceeds, according to the petition, had the effect of defrauding other creditors. Petrulis sought to recover the insurance proceeds as well as double damages (see § 859). The petition was served on the lenders.

In April and May 2002, several lenders filed objections to the petition. In June 2002, Petrulis filed a reply to the objections, explaining that the lenders had charged usurious interest on the loans, and some of the lenders had defrauded other creditors through the receipt of life insurance proceeds. Petrulis argued that the lenders, collectively, constituted a single joint venture or partnership.

In subsequent amended petitions, filed in September 2002 and February 2003, Petrulis alleged that the lenders had charged usurious rates and defrauded other creditors by accepting assignments of the life insurance proceeds. He sought to (1) recover usury penalties and specified interest payments, (2) reduce the balance of the loans by the amount of interest paid, and (3) recover property fraudulently transferred to other creditors.

On August 26, 2002, Petrulis filed an ex parte petition, seeking the trial court's approval of three agreements related to Goodson's compensation as counsel for the estate. The petition recited that the estate had no assets to inventory; the estate's primary asset was a claim against the lenders for the recovery of insurance proceeds and a potential recovery of usurious interest; the estate also had a claim against Prudential Insurance Company of America (Prudential) for wrongfully paying proceeds to certain lenders under two life insurance policies and wrongfully withholding proceeds from the estate under a third policy; the lenders' claims against the estate exceeded $12 million; and the estate was without resources to defend itself against the lenders and to pursue its own claims.

Petrulis requested that the trial court dispense with notice of the petition to the lenders, other creditors, and Prudential on the ground that knowledge of the "details and structure" of the agreements would put the estate "at a disadvantage in the litigation." Petrulis also sought to dispense with notice for the sake of expediency in light of an impending trial date in one matter. The petition stated that "[t]he creation of a pool of assets for the Estate will permit those creditors who are owed money to receive some or all of the amounts owed."

In one of the proposed agreements, Barbara Stevenson, the decedent's surviving spouse, sole beneficiary, and trustee of the Stevenson Family Trust, agreed to loan the estate $50,000 for litigation costs, with the remaining costs to be advanced by Goodson. In another agreement, the estate agreed that Goodson would be paid on a contingency fee basis in bringing suit against Prudential; Goodson was entitled to 33 1/3 percent of any recovery obtained before a trial became probable, 40 percent thereafter.

The third proposed agreement, the "Lodestar Fee Agreement," stated that Goodson would be paid its normal hourly rates "multiplied by a . . . factor of . . . two hundred percent" for work on claims involving the lenders, plus reimbursement of costs. The multiplier was said to be appropriate given the "contingent nature of the payment of said fees and the deferral of the payment of said fees, if at all." The Lodestar Fee Agreement further provided: "If the assets of the Estate after payment of all other statutory attorney fees and costs, representative's commissions and any other administrative costs ('Net Assets') are not adequate to pay the Attorney's Fees in full, [Goodson] agrees to reduce its Attorney's Fees to an amount equal to the greater of (1) the Net Assets available in the Estate which are payable to and are paid to [Goodson]; or (2) [Goodson's] normal hourly rates without a [multiplier]." And if the "Net Assets" were not adequate to pay Goodson using its normal hourly rates, Barbara was personally obligated to make up the difference, not to exceed $250,000. Goodson was to have a lien on the estate's claims and any recovery.

On September 3, 2002, after a hearing attended by Petrulis and an attorney representing Barbara, the trial court, Commissioner H. Ronald Hauptman presiding, dispensed with notice of the petition, approved the three agreements, and ordered the petition to be sealed until all litigation matters had been resolved.

Respondent William Wilks had filed a creditor's claim against the estate, seeking $1.34 million in unpaid loans and interest. He had also requested special notice. After negotiations with the estate, Wilks reduced his claim to $627,725. At the time, he did not know about the existence or approval of the Lodestar Fee Agreement. The estate accepted Wilks's compromise, agreeing not to contest it or seek to increase or decrease the amount. The trial court approved the settlement.

The estate engaged in settlement negotiations with other lenders, working with a forensic accountant in that effort. The estate was successful in negotiating a reduction in the amounts of almost all claims; some lenders agreed that they owed money to the estate. Upon petition by Petrulis, the trial court approved the settlements with these lenders, around 38 in all.

On August 15, 2003, Petrulis filed a petition for the payment of attorney fees pursuant to the Lodestar Fee Agreement. A hearing was scheduled for September 23, 2003. According to the petition, Goodson had spent 2,127.1 hours on the lenders' claims, which had initially totaled about $12.2 million. Through settlement, Goodson had reduced that amount to around $1.7 million. In addition, certain lenders had agreed to pay money to the estate, totaling $698,585. The estate therefore had a negative net worth of about $1 million.

In the petition, Petrulis contended that, based on normal hourly rates, Goodson would be entitled to $627,213 in attorney fees. But using the multiplier set forth in the Lodestar Fee Agreement, Petrulis actually requested fees of $1.25 million, plus $70,870 in costs. Notice of the hearing on the petition was served on, among others, creditors who had requested special notice.

After receipt of the notice, Wilks filed objections to the petition. He pointed out he had never been given notice of the Lodestar Fee Agreement or an opportunity to object to it. He asserted that Goodson had induced him to reduce his $1.3 million claim to around $627,000 by telling him he would probably get "100% on the dollar of his compromised claim." Wilks argued that Goodson's petition, if granted, would leave the estate with no assets for creditors—the same situation that existed before Goodson did any work for the estate. Thus, Goodson's efforts would have generated attorney fees, nothing more.

At the hearing on the petition, Petrulis recommended that the trial court make an interim award of $500,000. The trial court awarded $100,000 and continued proceedings on the issue pending mediation of claims the estate had brought against Barbara and the family trust. The mediation was unsuccessful.

On April 1, 2004, the trial court, Judge Warren L. Ettinger presiding, conducted a trial on Petrulis's fee petition and the estate's claims against Barbara and the trust. Petrulis testified that, in seeking approval of the Lodestar Fee Agreement, he had wanted to dispense with notice because "[t]he terms of the fee agreement would reveal our litigation strategy and give an advantage to the people we were suing."

The proceedings resumed on May 12, 2004. At the end of the session, the trial court commented that Goodson had done "a heroic job" on behalf of the estate, and Petrulis's testimony had been "flawless." But the court expressed concern with the idea that "the lawyers are the only ones who are going to get the money" and elaborated: "[T]his is not, in my opinion, a lodestar case.

It isn't going to happen. I wish I could tell the lawyers for the [estate] they were going to get paid their money, but I am going to make an award that I believe is an appropriate award, and I hope that they are successful when it comes to the insurance company so there is enough money in the pot so that they can get paid."[1] The court took the matter under submission.

In a statement of decision filed July 8, 2004, the trial court found in favor of Barbara and the family trust on all claims. The court did not rule on the fee petition at that time. In fact, more than 90 days after taking the attorney fee issue under submission, the trial court still had not issued a ruling on the petition.

On December 13, 2004, Petrulis filed a petition for writ of mandate with this court, seeking a peremptory writ directing the trial court to issue a ruling on the attorney fees petition. On January 27, 2005, we filed an opinion and order, instructing the trial court to rule on the matter within 20 days (*Petrulis v. Superior Court* (Jan. 27, 2005, B179787) [nonpub. opn.]).

On February 4, 2005, the trial court issued a minute order, concluding: "[T]he estate cannot be considered to have received a benefit if only attorney's fees and administrative costs are generated. [¶] Though the lodestar contract was approved by the Court, we must assess realistically what benefit there was to the estate by settlements reducing claims, and which go unpaid. [¶] . . . [G]ood faith with creditors would require a substantial payment consistent with the settlement. The estate should not have been 'created' to pay legal fees. [¶] . . . The issue of litigation counsel's fees may be reconsidered on the filing of a final account . . . ." The court awarded $200,000 in fees and $73,144 in costs. A formal order was later entered to the same effect. Petrulis appealed.

## II

## DISCUSSION

We review the trial court's decision for an abuse of discretion. (See *Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1448 [77 Cal.Rptr.2d 463]; *Estate of Heller* (1992) 7 Cal.App.4th 862, 864 [9 Cal.Rptr.2d 274].) We find no such abuse.

---

[1] In its suit against Prudential (*Petrulis v. The Prudential Insurance Company of America* (Super. Ct. L.A. County, 2005, No. BC296439)), the estate eventually recovered a judgment of $6 million in damages and $715,078 in interest. Prudential appealed. The appeal is pending in Division Two of this court (B184869). The opening brief has not yet been filed.

### A. *Approval of Lodestar Fee Agreement*

Petrulis bases his primary challenge to the attorney fee award on section 10811, subdivision (c), which provides in part: "An attorney for the personal representative may agree to perform extraordinary service on a *contingent fee* basis subject to the following conditions: [¶] (1) The agreement is written and complies with all the requirements of Section 6147 of the Business and Professions Code. [¶] (2) The agreement is approved by the court following a hearing *noticed* as provided in [Probate Code] Section 10812. . . ." (Italics added; hereafter section 10811(c).)

Section 10812, in turn, states: "Notice of the hearing on the petition shall be given as provided in Section 1220 to all of the following persons: [¶] . . . Each person listed in Section 1220." (§ 10812, subd. (c)(1).) Section 1220 requires that at least 15 days' notice of the hearing be given to, among others, "[a]ll persons who have requested special notice." (§ 1220, subd. (a)(2)(B).) For "good cause," the trial court may dispense with notice. (*Id.*, subd. (c).)

Petrulis argues that, once the trial court approved the Lodestar Fee Agreement, Goodson was entitled to fees according to the plain terms of the agreement: payment for total hours worked, using Goodson's normal hourly billing rates and a multiplier of 200 percent. We disagree for two reasons. First, the approved fee agreement does not come within section 10811(c). Second, the trial court, at Petrulis's request, erroneously dispensed with notice of the hearing on the proposed agreement.

#### 1. *Scope of Section 10811(c)*

As stated, section 10811(c) permits an attorney to perform extraordinary services on a contingency fee basis provided the fee agreement is first approved by the court. (§ 10811(c)(2).) Such services include litigation to benefit the estate and the settlement of creditors' claims. (See *Estate of Hilton* (1996) 44 Cal.App.4th 890, 895, fn. 5 [52 Cal.Rptr.2d 491]; *Estate of Keith* (1936) 16 Cal.App.2d 67, 68–70 [60 P.2d 171]; Cal. Rules of Court, rule 7.703(c), adopted Jan. 1, 2003; 2 Cal. Decedent Estate Practice (Cont.Ed.Bar 2006) § 20.20, pp. 20-36 to 20-37.) The question here is whether the Lodestar Fee Agreement constitutes a "contingency fee" agreement within the meaning of the statute. We conclude it does not.

Under the agreement, Goodson was to be paid for the *total number of hours worked* based on *hourly rates*—twice the firm's normal hourly rates if sufficient assets were available after the estate paid administrative expenses

(see, e.g., §§ 10800, 10810); otherwise, at normal hourly rates. Barbara was personally obligated to pay up to $250,000 in attorney fees if normal hourly rates were used.

■ Contingency fee agreements typically provide that counsel shall recover a flat or sliding-scale percentage of "any" recovery, that is, *if* there is a recovery. (See *Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 928–929 [211 Cal.Rptr. 77, 695 P.2d 164], app. dism. (1985) 474 U.S. 990 [88 L.Ed.2d 352, 106 S.Ct. 421]; *Epstein v. Abrams* (1997) 57 Cal.App.4th 1159, 1169 & fn. 6 [67 Cal.Rptr.2d 555]; Dimitriou, Fee Agreement Forms Manual (Cont.Ed.Bar 2005) § 1.11, pp. 17, 19.) Fees under a contingency fee agreement are not a sure thing. No recovery means no fees. (See *Draper v. Aceto* (2001) 26 Cal.4th 1086, 1089–1090, 1094–1095 [113 Cal.Rptr.2d 61, 33 P.3d 479]; *Jalali v. Root* (2003) 109 Cal.App.4th 1768, 1777 [1 Cal.Rptr.3d 689].) But here the agreement provided for an award of fees once Goodson started work on the matter regardless of the outcome. The existence and value of assets in the estate determined only whether the fee award would be based on normal hourly rates or double those rates. Naturally there was a risk that the fee award might not be paid or collectable—for example, Barbara might not honor the personal guarantee—but that risk is inherent in all fee agreements and does not, by itself, give rise to a contingency fee agreement.

Further, the use of percentages in contingency fee agreements ensures that the client will receive a portion of any recovery. Yet, the Lodestar Fee Agreement gives attorney fees priority over everything but the estate's administrative expenses, potentially leaving nothing for creditors or the sole beneficiary. Indeed, Goodson argues that, under the agreement, it was entitled to fees of more than $1 million notwithstanding that the assets in the estate were worth only about $700,000, and the estate owed the lenders around $1.7 million.

Courts frequently distinguish between contingency fees, on the one hand, and hourly rate compensation, on the other. (See, e.g., *Andre v. City of West Sacramento* (2001) 92 Cal.App.4th 532, 536–537 [111 Cal.Rptr.2d 891] [statutory attorney fee award should be based on number of hours reasonably expended and reasonable hourly rate, not contingency fee agreement]; *Rothman v. Dolin* (1993) 20 Cal.App.4th 755, 757–759 [24 Cal.Rptr.2d 571] [after dissolution of law firm, shareholders were to share equally in fees received from contingency fee cases and hourly rate cases]; *In re County of Orange* (C.D.Cal. 1999) 241 B.R. 212, 215, 221, 223 [attorney fee agreement based on "benchmark" hourly billing rates, subject to minor adjustment under other factors, was not a contingency fee agreement under California law].)

State statutes also distinguish between contingency fee agreements and agreements providing for hourly compensation. (See Bus. & Prof. Code, §§ 6146, 6147.5 [regulating percentages used in certain contingency fee agreements]; *id.*, § 6148 [noncontingency fee agreements shall state "hourly rates"]; see also *Franklin v. Appel* (1992) 8 Cal.App.4th 875, 886–892 [10 Cal.Rptr.2d 759] [discussing legislative history of statutes governing fee agreements].) Consistent with these statutes, the State Bar has drafted three "Sample Written Fee Agreement Forms": an *"Hourly* Litigation Agreement"; an *"Hourly* Non-Litigation Agreement"; and a *"Contingency Fee* Agreement" based on *percentages of any recovery*. (See Dimitriou, Fee Agreement Forms Manual, *supra*, appen. C, pp. 129–162.) One leading treatise recommends that a petition seeking approval of a contingency fee agreement under section 10811(c) make reference to the percentages used in the agreement. (2 Cal. Decedent Estate Practice, *supra*, § 20.31C, p. 20-43, par. 6.)

Finally, the legislative history of section 10811(c) supports the conclusion that the Lodestar Fee Agreement is not within the scope of the statute. Enacted in 1993, section 10811(c) reflected the Legislature's concern that "[t]here is old case law, predating the expansion of the jurisdiction of the superior court sitting in probate (and making the probate court a 'general power' court) that an attorney for a personal representative may not receive extraordinary compensation based upon a contingent fee agreement." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 908 (1993–1994 Reg. Sess.) as introduced Mar. 1, 1993, p. 3; see Stats. 1993, ch. 527, § 4, p. 2712.) The committee analysis noted: "Although the expansion of the probate court's jurisdiction probably now permits the court to approve a contingent fee contract (thus overruling prior case law by implication), the result is uncertain." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 908, *supra*, at p. 3.) In particular, the Legislature was concerned about two older cases, *Estate of Kerr* (1966) 63 Cal.2d 875 [48 Cal.Rptr. 707, 409 P.2d 931] and *Estate of Hastings* (1952) 108 Cal.App.2d 713 [239 P.2d 684]. (See Assem. Com. on Judiciary, Analysis of Assem. Bill No. 908, *supra*, at p. 3.)

In *Estate of Kerr*, *supra*, 63 Cal.2d 875, the California Supreme Court had observed that "a contingent fee contract for services rendered as attorney for an executor is invalid." *(Id.* at p. 878.) Nevertheless, the court upheld the fee contract before it, which entitled counsel to one-half of the recovery, because the legal services were performed for the sole beneficiary of the estate, not the executor. *(Id.* at pp. 878–879.) And in *Estate of Hastings*, *supra*, 108 Cal.App.2d 713, the Court of Appeal invalidated a contingency fee agreement, which gave counsel 40 percent of any recovery, explaining: " '[T]he allowance for attorneys' fees to be made by the court . . . should be a definite, fixed and certain cash allowance, and not a percentage of the value of assets

recovered or to be recovered for the estate, particularly of assets which are not yet finally a part of the estate and which might not become or remain a part of the estate, which was the situation in the instant case at the time the order was made. The order appealed from did not actually allow or fix a fee or an amount of compensation . . . but rather adopted a formula or gauge or measure for determining the amount of the fee to be allowed at some future time.' " (*Id.* at p. 716.)

By enacting section 10811(c), the Legislature overruled *Estate of Kerr* and *Estate of Hastings* and permitted an estate's attorneys to be compensated for extraordinary services by way of an agreement that grants them a percentage or portion of any recovery. As the Legislature recognized, "There are some instances when the probability of recovery on a lawsuit or other claim might cause the normal compensation of the attorney for the personal representative to be uneconomical for the estate or the attorney, absent a contingency fee contract." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 908, *supra*, at pp. 3–4, italics added.)

██ In this case, the Lodestar Fee Agreement did not state that Goodson would receive a percentage or portion of any recovery. Rather, it authorized Goodson to take the *entire* recovery. And in the petition for the payment of attorney fees, Petrulis claimed, incredibly, that Goodson was entitled to *more than* the entire recovery. Further, the agreement *guaranteed* that Goodson would be awarded attorney fees in *some* amount—based on normal hourly rates if the estate's assets were inadequate to pay double hourly rates. Accordingly, the Lodestar Fee Agreement did not constitute a contingency fee agreement, and section 10811(c) did not apply.[2]

### 2. *Lack of Notice of the Petition*

In the alternative, the trial court erred in dispensing with notice of the hearing on the petition to approve the Lodestar Fee Agreement. The trial court approved the agreement by way of an ex parte petition, dispensed with notice of the hearing, and ordered the petition sealed until the estate concluded all litigation. Sections 10811(c)(2) and 1220, subdivision (a)(2), *required* notice of such a hearing unless there was "good cause" to dispense with it (§ 1220, subd. (c)). As we explain, good cause did not exist.

Petrulis contends the lack of notice was proper because he did not want creditors to learn about his litigation strategy; if they did, he argues, they

---

[2] We express no view on whether agreements with different terms—like a "hybrid" agreement that uses both hourly rates and percentages (see Dimitriou, Fee Agreement Forms Manual, *supra*, § 1.11, p. 21)—are within the scope of the statute.

would have had an unfair advantage in the litigation. Also, expediency supposedly justified the lack of notice because of an approaching trial date.

Notice is the cornerstone of estate proceedings. (See, e.g., §§ 1042 [notice of all probate hearings], 1200–1213 [general notice provisions], 1215–1230 [manner of notice], 1250–1252 [request for special notice of estate proceedings], 8100–8125 [notice of hearing on petition to administer estate], 9001, 9050–9052 [notice of administration of estate to decedent's creditors], 9202 [notice of decedent's death to state], 10830 [notice of hearing on petition to award interim attorney fees], 10831 [notice of hearing on petition to award attorney fees upon final accounting].) As a matter of fundamental rights, creditors who are known or reasonably ascertainable must be notified—in a manner reasonably calculated to provide actual notice—that probate proceedings have been instituted. (See *Tulsa Professional Collection Services v. Pope* (1988) 485 U.S. 478, 487–491 [99 L.Ed.2d 565, 108 S.Ct. 1340, 1346–1348]; *Venturi v. Taylor* (1995) 35 Cal.App.4th 16, 20–23 [41 Cal.Rptr.2d 272].) The presumption is therefore in favor of notice under section 10811(c).

Contrary to Petrulis's concerns, the Lodestar Fee Agreement did not disclose "litigation strategy." It simply described the estate's claims against the lenders, namely, the lenders had charged usurious interest, and some lenders had improperly received life insurance proceeds. The estate's petition to establish ownership of property and its reply to the creditors' objections, both of which were filed *before* the petition to approve the Lodestar Fee Agreement, disclosed exactly this "litigation strategy." Thus, the fee petition and the Lodestar Fee Agreement did not reveal anything new.

Further, litigants are not permitted to play "hide and seek" with respect to theories of liability. The estate had no choice but to disclose its so-called litigation strategy in various papers filed with the court during the course of the litigation—in its petition to establish ownership of property, reply to the creditor's objections, mediation brief, and trial brief. There can be little reason to keep something secret when routine court proceedings require that it be disclosed before and after an ex parte hearing.

Nor should creditors be kept in the dark about a court-approved method of compensating an estate's attorney. The Lodestar Fee Agreement arguably gave Goodson the right to recover *all* of its fees out of the estate's assets—at twice the normal hourly rates—*before* creditors could recover *anything*. Consequently, the lenders had a significant interest in knowing about Goodson's compensation before negotiating with the estate to reduce the amount of their claims. A court cannot approve an agreement under section 10811(c) unless it finds that the agreement is "in the best interests of the persons who are interested in the estate" (§ 10811(c)(3)), which

includes creditors (§ 48, subd. (a)(1)). Here, an entire group of interested persons was excluded from the decisionmaking process.

Last, expediency did not justify dispensing with notice. The record does not suggest the lenders were at fault for the estate's failure to seek approval of the Lodestar Fee Agreement at an earlier point. And by invoking expediency and keeping the agreement a secret, the estate should have known that it was merely postponing objections by the creditors. Having opted for expediency early on, the estate cannot legitimately complain that Wilks eventually got his day in court. Thus, there was no good cause for dispensing with notice, and the trial court erred in that respect.

 In sum, because the Lodestar Fee Agreement was not a contingency fee agreement and was approved without notice, the agreement was not proper under section 10811(c). Petrulis does not contend the agreement was otherwise authorized by the Probate Code. Thus, the order approving the agreement was invalid. (See *Selma Auto Mall II v. Appellate Department* (1996) 44 Cal.App.4th 1672, 1683–1684 [52 Cal.Rptr.2d 599]; *Estate of Sigourney* (2001) 93 Cal.App.4th 593, 601 [113 Cal.Rptr.2d 274]; *Reid v. Balter* (1993) 14 Cal.App.4th 1186, 1193 [18 Cal.Rptr.2d 287]; *Irons v. Superior Court* (1935) 10 Cal.App.2d 523, 524–526 [52 P.2d 553].) As a consequence, the agreement was nothing more than a private contract between Petrulis and Goodson. And "the court, in determining the amount due an attorney for extraordinary services to an estate, is not bound by the terms of compensation specified in a contract of employment between the attorney and the estate's representative . . . ." (*Estate of Trynin* (1989) 49 Cal.3d 868, 873 [264 Cal.Rptr. 93, 782 P.2d 232]; see also § 10813.) "Although the terms of the contract may be considered, they 'do not compel any particular award.' " (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

## B. *Reconsideration of the Agreement's Approval*

Petrulis argues that Wilks could not simply object to the petition for the payment of fees (filed in September 2003) but had to satisfy the requirements for a motion for reconsideration under section 1008 of the Code of Civil Procedure. According to Petrulis, Wilks had to request formally that the trial court reconsider its prior order approving the Lodestar Fee Agreement (filed in September 2002).

Code of Civil Procedure section 1008 provides: "When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days *after service upon the party of written notice of*

*entry of the order* and based upon *new or different facts, circumstances, or law*, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit *what application was made before, when and to what judge, what order or decisions were made*, and what *new or different facts, circumstances, or law* are claimed to be shown." (Code Civ. Proc., § 1008, subd. (a), italics added.)

We do not see how this statute applied to Wilks. He was never served with written notice of entry of the order approving the Lodestar Fee Agreement. For that matter, nor was he served with notice of the hearing on the underlying petition. And the trial court ordered the petition to be sealed. Thus, he could not be expected to know "what application was made before," the precise nature of the earlier decision, or how the facts or circumstances might have changed.

■ Based on its language, the statute does not apply where the person making his *initial* objections was not properly notified of, and did not know about, the prior proceeding or the ensuing order. In essence, Wilks was asking the trial court to consider his objections *for the first time*, having been wrongly excluded from the process that led to the order. As stated, that order, which approved the Lodestar Fee Agreement, was invalid. (See pt. II.A., *ante*.) Accordingly, Wilks did not have to comply with the statutory requirements for reconsideration. (See *Wilson v. Science Applications Internat. Corp.* (1997) 52 Cal.App.4th 1025, 1031 [60 Cal.Rptr.2d 883] [Code of Civil Procedure section 1008 applies to "lawful" or "duly made" orders].)

■ On a related point, we reject Petrulis's assertion that Wilks could not object to the petition for the payment of attorney fees but was limited to filing an appeal from the earlier order approving the Lodestar Fee Agreement. We assume, without deciding, that the order approving the agreement was appealable. Even so, an aggrieved creditor should be permitted to object to a subsequent request for fees if he knew nothing about the order because the administrator was erroneously excused from giving notice of the prior proceeding in violation of statutory requirements. The law does not demand the impossible. (See Civ. Code, § 3531.)

C. *Vested Right in the Lodestar Fee Agreement*

Petrulis claims that Goodson had a vested right in an award of attorney fees under the Lodestar Fee Agreement once the agreement was approved. Although, in certain situations, a court cannot direct an attorney to disgorge attorney fees already paid (see *Estate of Hilton, supra,* 44 Cal.App.4th at pp. 906–910), that did not happen here.

The trial court simply approved a fee agreement. It did not award any fees at that time. Wilks never sought the return of fees already paid. And because the Lodestar Fee Agreement was not properly approved under the Probate Code, it was not binding on the trial court. (See *Estate of Trynin, supra,* 49 Cal.3d at p. 873.) It follows that Goodson did not acquire a vested right in a *specific amount* of attorney fees under the agreement. (See *PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at p. 1096.)

## D. *Fair Notice of Reconsideration*

Petrulis argues the estate did not have fair notice that the trial court might reconsider whether to award attorney fees pursuant to the Lodestar Fee Agreement. Not so. Wilks served written objections to the petition for the payment of fees, arguing that the petition, if approved, would leave nothing for the lenders. The trial court adopted that very reasoning. And the estate's trial brief specifically addressed Wilks's objections on the merits.

## E. *Priority of Payment of Debts*

 Under section 11420, administrative expenses, which include attorney fees, must be paid before the estate pays general creditors like the lenders. (§ 11420, subd. (a)(1), (7); *Estate of Turino* (1970) 8 Cal.App.3d 642, 647–648 [87 Cal.Rptr. 581].) Petrulis interprets this statute to mean that the trial court had to award Goodson *all* of its *requested* fees and that whatever was left, if anything, could go to the lenders or others.[3]

But section 11420 controls only the *priority* of payment, that is, the *order* in which various types of expenses are to be paid, not the *amount.* The statute dictates who gets paid first, second, and on down the line. It does not govern *how much* anyone is to be paid or *how* any particular amount is to be calculated. Rather, the trial court first determines the amount of attorney fees by applying criteria specified elsewhere (see pt. II.F., *post*), and section 11420 then ensures that the attorneys get paid in full before any general creditors are paid.

---

[3] Section 11420 states: "(a) Debts shall be paid in the following order of priority among classes of debts . . . : [¶] (1) Expenses of administration. . . . [¶] (2) Obligations secured by a mortgage, deed of trust, or other lien . . . . [¶] (3) Funeral expenses. [¶] (4) Expenses of last illness. [¶] (5) Family allowance. [¶] (6) Wage claims. [¶] (7) General debts, including judgments not secured by a lien and all other debts not included in a prior class. [¶] (b) Except as otherwise provided by statute, the debts of each class are without preference or priority one over another. No debt of any class may be paid until all those of prior classes are paid in full. . . ."

### F. *Factors for Determining Fees for Extraordinary Services*

■ "Every [probate] attorney should be fully and fairly paid for his services, having in mind their nature, their difficulty, *the value of the estate*, and the responsibility thus cast upon the counselor." (*Estate of Byrne* (1898) 122 Cal. 260, 266 [54 P. 957], italics added.)

" '[The statute authorizing allowances of extraordinary fees] leaves the matter within the sound discretion of the trial court, and does not make it mandatory upon the court to grant extra allowance of fees on account of [extraordinary] services. In making such allowance or disallowing a claim therefor, the trial court necessarily takes into consideration *the value of the estate*, the work performed by the attorney in the *routine* administration thereof, and the amount to which the attorney would legally be entitled, calculated according to the provisions of the Probate Code, and if the sum allowed by law appears to be a reasonable compensation, even though the attorney may have performed some extraordinary services, it is within the sound discretion of the trial court to disallow claims for extra compensation . . . .' " (*Estate of Hilton, supra*, 44 Cal.App.4th at pp. 918–919.) A fee award for extraordinary services must be "just and reasonable." (§ 10811, subd. (a).)

The trial court expressly found that Goodson's efforts, though "heroic," had done virtually nothing to benefit the estate. The lenders' claims, though substantially reduced through settlements, still exceeded the estate's assets by about $1 million. The assets were worth about $700,000. At most, according to the trial court, Goodson had created an estate to pay legal fees.

Nevertheless, Petrulis argued that Goodson should be awarded more than $1 million in fees. But from what source was that sum to have been paid? The request appeared incredible on its face. Given that the assets in the estate did not exceed $700,000, we cannot say that a fee award of $200,000 was an abuse of discretion. That left $427,000 in assets (after the award of costs) and $1.7 million still due the lenders.

Further, the petition to approve the Lodestar Fee Agreement specifically stated, "The creation of a pool of assets for the Estate will permit those creditors who are owed money to receive *some or all* of the amounts owed." But the petition for payment of attorney fees left *nothing* for them. The trial court acted within its discretion in rejecting that result. And, as stated by the trial court, "The issue of litigation counsel's fees may be reconsidered on the filing of a final account . . . ."

## III

## DISPOSITION

The order is affirmed.

Spencer, P. J., concurred. Vogel, J., concurred in the judgment only.

A petition for a rehearing was denied August 17, 2006, and appellant's petition for review by the Supreme Court was denied October 25, 2006, S146510.